Argued and submitted July 31, affirmed December 6, 2006,
petition for review allowed March 7, 2007 (342 Or 473)

# STATE OF OREGON,
*Respondent,*

*v.*

# ROY NORMAN KNIGHT,
*Appellant.*

## 03023540C; A122440

149 P3d 164

Tammy W. Sun, Deputy Public Defender, argued the cause for appellant. With her on the brief were Peter A. Ozanne, Executive Director, and Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.

Christina M. Hutchins, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, Brewer, Chief Judge, and Rosenblum, Judge.

ROSENBLUM, J.

## ROSENBLUM, J.

A jury convicted defendant of sexual abuse in the first degree, ORS 163.427, and unlawful sexual penetration in the second degree, ORS 163.408. Defendant appeals, arguing that the trial court erred in allowing the state to play for the jury a recording of a telephone conversation in which defendant made several very disparaging remarks about his attorney. He argues that the recording was irrelevant, that any probative value it may have had was outweighed by the danger of unfair prejudice, and that allowing the jury to hear the recording violated his constitutional right to counsel. We reject defendant's first and third arguments without discussion and write to address only his second argument. On review for abuse of discretion, *State v. Voits*, 186 Or App 643, 659, 64 P3d 1156, *rev den*, 336 Or 17 (2003), *cert den*, 541 US 908 (2004), we affirm.

The facts pertinent to this appeal are not in dispute. Defendant took his girlfriend's 13-year-old daughter (the victim) and his 9-year-old son camping. All three slept in a station wagon—defendant and the victim in the back and defendant's son across the front seats. The victim alleged that, on the second night of the trip, defendant put his hand down her pants and inserted his finger into her vagina. Defendant was arrested and charged with sexual abuse and unlawful sexual penetration.

At defendant's trial, the state's case-in-chief consisted primarily of the victim's testimony and statements that she had made to investigators and a nurse who had examined her. There was no physical evidence of abuse. The state also called defendant's son as a witness. He testified that he had not seen or heard any abuse, but his testimony about some of the circumstances of the trip conflicted with defendant's story.[1]

After the state rested, defendant put on evidence suggesting that the victim had made up the abuse allegations

---

[1] For example, defendant asserted that the sleeping arrangements were decided by playing a game called "odd man out" and that his son had lost the game and therefore had to sleep in the front of the station wagon. His son testified that defendant had ordered him to sleep in the front.

because she wanted to live with her grandparents. Defendant's girlfriend, Cyr—the victim's mother—testified that she, defendant, and their respective children[2] lived in a small apartment in which the victim had to share a bedroom with her sister, and that the victim complained that they never had money to "go anywhere or do anything." Cyr testified further that, "at Grandma's house," the victim had her own bedroom and received "all kinds of clothes and things," that "they travel with her, they take her on camping trips," and that "[t]hey've given her square dance lessons, gymnastics, horseback riding lessons, they went to Canada together, and she gets to do a lot of fun stuff that she doesn't get to do at home." She also stated that the victim received very preferential treatment from her grandparents in comparison with the rest of the grandchildren. Defendant also called as a witness the victim's aunt, who gave similar testimony about the circumstances at "Grandma's house."

Defendant testified in his own defense. He denied ever having touched the victim inappropriately. During his testimony, he made several statements about being a good parent and "do[ing] the right thing" for both his and Cyr's children. At one point, he said that he had to be cautious about playing favorites because he was "biased to my own children because I—I love them very much." On cross-examination, the prosecutor reminded defendant that he had made those statements, and defendant agreed that he had. The prosecutor then sought to play for the jury a recording of a telephone conversation that defendant had with his mother while he was in custody awaiting trial. She first made an offer of proof as to the portion of the recording that she wished to play for the jury.

In the recorded conversation, defendant told his mother, "I've got papers here to sign my kids over to the state," explaining, "I am preparing myself to go to prison because of this shit getting all fucked up." He then said, "If you and [Cyr] cannot get me a good lawyer, I'm going to go do my fucking time, I'm going to sign my kids over to the State of Oregon, and you guys will never fucking see me again." When

---

[2] Defendant has two children from a previous relationship. Cyr has three children, also from a previous relationship.

his mother objected that she and Cyr had done everything they could, defendant replied, "No. No. When I've got a different fucking lawyer, then you've done everything you can. If it was you, I would do anything." His mother reiterated that she had done everything she could, to which defendant replied, "Okay. Okay, listen, you do what you got to do, and I'm going to do what I'm going to do, but that is exactly what I'm going to do." Defendant's mother objected that he could not let his children "pay the dues for all of this." Defendant said, "Listen, I'm not taking it out on my kids. I'm not. That— I'm telling you what I'm going to do, and you can count on it. If I go to court with this fucking attorney, I'm fucked."

The conversation continued in the same vein. Defendant's mother again said, "I have done everything." Defendant replied,

"Okay. Listen. Listen. I don't care what you can't do. I don't care what you've done—what you have done. I'm telling you if I go to trial with this fucking attorney, I'm signing my kids over to the state, and I'm going to go and do my time, and then I'm going to live in Mexico. I am not going to live in America with a fucking sex beef on me at 55 years old."

He added, "I'm going to go to jail with this motherfucker," and then told his mother, "All I'm looking for is go find a lawyer. I don't give a fuck if it's goddamn Mr. Magoo and on his first case." Defendant further pressed his mother to hire a new lawyer, exhorting, "Sign a promissory note, sign a lien. I don't give a shit. I can fix it if I get out."

Defendant then instructed his mother, "You tell [Cyr] to come and visit me tonight." She replied that Cyr might be working. Defendant said, "I don't give a fuck. If she gets fired, I don't care. We're talking about 17 years of my life. I don't give a shit if she goes and robs a bank." His mother told him that that was not rational. He replied, "That is rational. You'll do less time robbing a bank than I will. Now, listen to me. I don't know what you guys are going to do, but I'm going to tell you what I'm going to do. If I go down for this, I'm turning my kids over to the state." The conversation ended shortly thereafter.

After playing the recording for the court, the prosecutor stated:

"It's the State's position, Judge, that he has sat up here and put on a front that he is the most caring father in the world, that parenting and doing the right thing and following through on his promises is what he's all about. They [the jurors] need to hear what he's really all about, that he would sign his kids over. It impeaches everything he just said today."

Defendant's counsel objected that the jury would likely surmise that defendant's derogatory remarks on the recording referred to him. He argued that allowing the jury to hear the recording would impede his ability to advocate on defendant's behalf: "[H]ow can I get up there and argue on—on his behalf when the jury's thinking, you know, this guy called his lawyer every name in the book, or referred to him as—as you know, basically incompetent."

The court initially ruled that much of the material on the recording was inadmissible, stating that the only relevant statement was defendant's comment about signing the children over to the state if his mother did not hire a new attorney. The court sustained defendant's objection as to the recording itself but allowed the prosecutor to ask defendant whether he made the statements regarding his children. The court told the prosecutor that, if defendant denied making the statements, the recording would be admissible for impeachment purposes.

The jury was brought back in, and the prosecutor continued cross-examination, asking defendant about the telephone conversation with his mother: "And during that phone conversation numerous times over and over you threatened to turn your children—sign them over to the State of Oregon if you didn't get your way, didn't you?" Defendant admitted saying that he would sign the children over to the state. The prosecutor ended her questioning there. Defendant then asked whether he could explain his statement. The court allowed him to. Defendant began, "I've been in jail for 5 months awaiting trial, trying to do what's right in getting a— a—a lawyer that I'm—I'm." The prosecutor interrupted: "Judge, I'm going to object. This is what we just talked about." The court responded, "Well, if he wants to submit it, that's * * * I don't think there's a basis for the State to object."

Defendant continued:

"I love my sons very dearly. They are the thing that I care most about in life. I want them happy, I want them safe, I want them well handled and cared for. I did say that I * * * would sign them over to the State. I believe that'll be a decent life for them. I think it would be the worst, not in the conventional sense, I want my sons happy. I want them taken care of. I have some problems with my family that I cannot leave my children to them for. Not for any sexual abuse or any kind of strange behavior. My mother's old, my sister needs to live a life, she needs to have the things that she deserves out of life. I cannot impose my children upon them. Through love for my children and ultimate care for my family I said that if I go to prison I will sign my children over to the State so that they will not be a burden on my family. It's not a bad thing. It's a good thing, and they're going to make it come up bad, and it's not what I want. I saw my son for the first time, and it killed me."

The prosecutor then asked the court for permission to play the recording of the telephone conversation. The court ruled that the entire recording had become relevant and admissible. Defendant's counsel objected on OEC 403 grounds, arguing that the recording was unfairly prejudicial because it would undercut his ability to effectively advocate for defendant. The court overruled his objection, stating,

"He has now testified that the reason he made those statements was because he was concerned about his children; didn't want to burden his mother. I think that—that brings in the entire tape to show the context of his statements. I think the ta—the tape as I heard it certainly indicates something other than what he's just testified to, so I think that makes the entire tape admissible."

The court acknowledged that defendant's statements would make his attorney's job more difficult, but it concluded that they would not make it impossible for him to represent defendant. The court also noted that, to the extent that his attorney's job was made harder, defendant himself was to blame. Defendant's attorney moved for a mistrial on the ground that the recording would irreparably prejudice the jury. The court denied the motion. The prosecutor then played the recording for the jury.

After the jury heard the recording, defendant again asked for an opportunity to explain, which the court allowed. Defendant said:

"The pressures that are on me in here are incredible. My life and my liberty and my freedom, everything that I hold dear. I don't have my children now. I don't. They're gone. I can't bear to live without my kids. I'm desperate. I'm—I'm on the verge of insanity. This is driving me to the brink. * * * I regret this statement. It's probably the—the worst thing I've ever done in my life, but desperate times call for desperate measures, and I'm a desperate man. A drowning man will grab [the] tip of a sword, and I am. I don't believe that everything has been done. There's evidence that hasn't been admitted into the case, and I just needed help, and I guess I don't know how to ask for it properly. Don't think me a monster, don't think me bad, don't think me evil because I'm not."

After defendant's last witness testified, defendant retook the stand to explain further. He testified:

"The phone call shames me. It taxes the relationship between my mother and myself. The only way I can get back to my children is through this court and through competent legal counsel, and I've looked. I've been an excellent father my entire life, for 10 years now, excellent, and with one statement they're going to take it all away from me[;] it's not fair. I said—I had my two sons out of wedlock. I fought for the custody of my children."

The prosecutor objected at that point on relevance grounds, and the court prevented defendant from testifying further on that point.

At the close of the trial, the jury found defendant guilty.

On appeal, defendant makes two assignments of error. He assigns error to the trial court's ruling allowing the jury to hear the recorded conversation and to the denial of his motion for a mistrial. He makes three arguments in support of both assignments. As noted above, we write only to address one of those arguments, namely, that the trial court abused its discretion in allowing the jury to hear the recording

because its probative value was substantially outweighed by the danger of unfair prejudice.

■ Defendant contends that the probative value of his statements about his attorney was minimal at best. He argues that his remarks about his children would have lost little significance without the accompanying remarks about his attorney. With respect to the danger of unfair prejudice, defendant argues that to allow a jury to hear a defendant vehemently stating that he believes he would be convicted if he were represented by his attorney at trial severely undermines that attorney's credibility before the jury and prejudices the defendant in the adversarial process. Defendant argues that his statements on the recording suggest that his attorney was incompetent, was not sufficiently zealous in his representation, and did not believe in defendant's innocence. He asserts that the evidence at trial consisted primarily of conflicting testimony between the victim and defendant regarding the events on the camping trip. In defendant's view, admitting his "derogatory statements severely compromised his attorney's ability to persuade the jury to defendant's version of the events. The jury very likely viewed defense counsel's efforts with suspicion and disbelief after hearing defendant's statements about his attorney."

The state agrees that the evidence consisted primarily of defendant's and the victim's conflicting testimony and argues that, consequently, the credibility of the witnesses was of paramount importance. In the state's view, the jury was entitled to use defendant's statements in the recording in evaluating his credibility. Thus, the state argues, the evidence had great probative value. In response to defendant's assertion that the evidence carried a substantial danger of unfair prejudice, the state does not dispute the prejudicial nature of defendant's remarks about his attorney. It contends, rather, that the *danger* of unfair prejudice was mitigated by the fact that the jury did not necessarily conclude that defendant was talking about his current attorney. According to the state, the jury may have concluded that defendant's mother acceded to his threats and hired a new attorney for him.

■  The evidentiary rule at issue here, OEC 403, provides, in part, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice * * *." In *State v. Mayfield*, 302 Or 631, 645, 733 P2d 438 (1987), the Supreme Court prescribed a four-step analysis that a trial court must apply in deciding whether evidence should be excluded under OEC 403 as unfairly prejudicial. *See State v. Shaw*, 338 Or 586, 614, 113 P3d 898 (2005) (trial courts "must" engage in each of the four analytical steps prescribed in *Mayfield*). First, the court must assess the proponent's need for the evidence. "In other words, the judge should analyze the quantum of probative value of the evidence and consider the weight or strength of the evidence." *Mayfield*, 302 Or at 645. Second, it must determine how prejudicial the evidence is—that is, "to what extent the evidence may distract the jury from the central question whether the defendant committed the charged crime." *Id.* Third, the court must weigh the proponent's need for the evidence against the danger of unfair prejudice. Fourth, the court must decide whether to admit all or part of the evidence. *Id.* "[W]e examine whether the trial court properly applied the balancing test that OEC 403 prescribes for errors of law, [but] we review the trial court's ultimate determination as to whether evidence is unfairly prejudicial under OEC 403 for abuse of discretion." *Shaw*, 338 Or at 614-15. A trial court errs as a matter of law if it "fails to exercise discretion, refuses to exercise discretion or fails to make a record which reflects an exercise of discretion." *Mayfield*, 302 Or at 645. An abuse of discretion occurs when a court exercises its discretion "to an end not justified by, and clearly against, evidence and reason." *State v. Mason*, 100 Or App 240, 243, 785 P2d 378 (1990).

We begin with the state's need for the evidence—in other words, its probative value. Defendant argues that the trial court admitted the comments about his attorney merely to provide context for his statements regarding his children and that those statements would have lost little significance without the accompanying remarks about his attorney. We disagree. Defendant's argument that the court admitted the remarks "merely" to provide context understates the significance of the particular context. The trial court concluded that

the state needed the evidence to impeach defendant's testimony as to the reason for telling his mother that he was prepared to sign away his parental rights. It found that the recording demonstrated that the context in which defendant had made the statements about giving up his parental rights was different from, and contradictory to, the context that he had portrayed to the jury. Whereas defendant had testified that he had told his mother that he would sign away his parental rights because of his "love for [his] children and ultimate care for [his] family," the recording indicated that defendant made the statements in an attempt to coerce his mother into hiring new counsel for him. Thus, the court admitted defendant's statements on the tape recording because they illustrated to the jury that the context of the statements about his children was different from what defendant had portrayed in his testimony and, in doing so, they impeached defendant's credibility as a witness.[3]

As both parties acknowledge, this is a case in which the credibility of the witnesses was of paramount importance. It follows that the probative value of the evidence was significantly greater than if it had been admitted merely to provide uncontroverted context. *See State v. Johanesen*, 319 Or 128, 135, 873 P2d 1065 (1994) ("Evidence helpful in evaluating the credibility of a witness is of consequence to the determination of the action." (Internal quotation marks omitted.)); *see also State v. Plummer*, 160 Or App 275, 280, 980 P2d 676 (1999) (when a witness is found to be false in part of the witness's testimony, the finder of fact is entitled to disbelieve all of the witness's testimony).

The second factor in the *Mayfield* analysis required the trial court to determine the danger of unfair prejudice—that is, the extent to which defendant's remarks on the recording would distract the jury from the real issues in the trial—namely, whether defendant had committed the charged crimes. The court acknowledged that defendant's remarks would likely have some effect on the jury, telling counsel, "I realize that it makes your job harder, but I don't think it eliminates your ability to represent him." On appeal,

---

[3] Defendant does not argue that the recording was offered as impeachment on a collateral matter. We therefore do not consider that issue.

defendant does not specifically challenge that assessment of the unfair prejudice, and we agree with it.[4]

We turn to the third *Mayfield* factor the balancing test. In analyzing that factor, we first consider whether the trial court balanced the probative value of the recording against the risk of unfair prejudice and whether the record adequately reflects the court's analysis. *See Mayfield*, 302 Or at 645 (failure to exercise discretion or to make a record reflecting that exercise is an error of law). We then consider whether the court abused its discretion in deciding that the probative value was not significantly outweighed. The record of the court's analysis is not as explicit as it could be. On the one hand, it appears from part of the court's ruling that it merely concluded that, because the recording was admissible, the fact that defendant made derogatory remarks about his attorney was inescapable. On the other hand, the court's statement about the prejudicial value of the evidence—that it did not eliminate counsel's ability to represent defendant— does indicate that the court weighed the admissibility of the evidence against the risk of unfair prejudice. *See State v. Meyers*, 132 Or App 585, 588, 889 P2d 374 (1995) (holding that the record adequately supported the trial court's decision "notwithstanding the fact that the court did not expressly follow the *Mayfield* analysis"). We conclude that the court's statements are sufficient to show that it did, in fact, engage in the required OEC 403 balancing.

Next, we consider whether the court abused its discretion in deciding to admit the evidence. We conclude that it did not. Although the evidence carried a risk of unfair prejudice, in light of its probative value on the question of credibility, we cannot say that the trial court's ruling was "not justified by, and clearly against, evidence and reason." *Mason*, 100 Or App at 243. It follows that the court did not abuse its

---

[4] As noted, the state argues that the risk of unfair prejudice was mitigated by the fact that the jury did not necessarily conclude that defendant's remarks on the recording referred to his trial counsel. Although that is true, it is also speculative; it is just as likely that the jury did conclude that defendant was referring to his trial counsel. We therefore conclude that the mitigating effect posited by the state is minimal at best.

discretion in concluding that the probative value of the evidence was not significantly outweighed by the danger of unfair prejudice.

We turn to the fourth *Mayfield* factor—whether to admit all or part of the evidence—only to note that defendant does not argue on appeal that the trial court should have admitted only some of his comments about his attorney. We therefore do not consider whether the trial court abused its discretion in admitting the entire recording.

Because we conclude that the trial court did not abuse its discretion in admitting the recording, we also conclude that the court did not err in denying defendant's motion for a mistrial.

Affirmed.