Argued and submitted June 19, decision of Court of Appeals and judgment of
circuit court reversed; case remanded to circuit court for new trial
December 6, 2007

## STATE OF OREGON,
*Respondent on Review,*

*v.*

## ROY NORMAN KNIGHT,
*Petitioner on Review.*

(CC 03023540C; CA A122440; SC S54423)

173 P3d 1210

Tammy W. Sun, Deputy Public Defender, Salem, argued the cause and filed the brief for petitioner on review. With her on the brief was Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.

Anna M. Joyce, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

GILLETTE, J.

Linder, J., dissented and filed an opinion, in which Kistler and Walters, JJ., joined.

**GILLETTE, J.**

In this criminal case, defendant challenges a trial court's decision to allow the jury to hear a recording of defendant making disparaging comments about his attorney and threatening to "sign [his] kids over to the state" if his mother did not retain a different attorney for him. Defendant contends that his comments about his attorney were inadmissible under the evidence code and that allowing the jury to hear them violated his constitutional right to counsel. The Court of Appeals decision affirmed the trial court's judgment. *State v. Knight*, 209 Or App 562, 149 P3d 164 (2006). We allowed defendant's petition for review and now agree with his argument that admission of his recorded comments was error and grounds for reversal. Accordingly, we reverse the decision of the Court of Appeals and the judgment of the trial court.

Defendant was charged with sexual abuse in the first degree, ORS 163.427, and unlawful sexual penetration in the second degree, ORS 163.408. The alleged victim was the 13-year-old daughter of defendant's girlfriend. At trial, the victim testified that defendant had taken her and defendant's nine-year-old son camping; that he had arranged to sleep with her in the back of the car—a station wagon—while his son slept in the front seat; and that, during the night, defendant had put his hand down her pants and inserted his finger into her vagina. Defendant testified in his own defense. Generally, defendant presented himself as a caring person and a good father who always did his best to accommodate the demands of his children. He testified that (1) the victim and his son had begged him to take them camping and he had agreed to take them because he was a good father, kept his promises, and wanted to "do the right thing for [his] kids"; (2) both children had wanted to sleep in the back of the car with him and that, rather than allowing his natural biases in favor of his own child to dictate the result, he had tried to keep things pleasant and fair by having the children resolve the dispute with a game of "odd man out" (which the victim won); (3) he had never touched the victim and thought that she had fabricated the sexual abuse story in order to alienate her mother and defendant so that she could go live

with her grandmother; and (4) he was a "serious parent," loved his children "very much," wanted to fulfill the expectations of his own and his girlfriend's children and wanted them to have good childhoods, and felt that "if you screw up your kids, you're better off not living."

After hearing defendant's testimony, the prosecutor announced that she wished to impeach defendant's various statements about his love and concern for his children by introducing a tape recording of a telephone conversation that defendant had with his mother while he was in jail awaiting trial. Because its admissibility was in question, the trial court first listened to the recording out of the presence of the jury.

In the recording, defendant was trying to persuade his mother to hire a private attorney for him, so that he would not have to go to trial with the attorney that the court had appointed. We quote from the recorded conversation at considerable length:

"Defendant: Yeah, but listen, that's not going to save my ass. I've got papers here to sign my kids over to the state.

"Mother: Why's that?

"Defendant: Because I'm preparing to go—I am preparing myself to go to prison because of this shit getting all fucked up.

"Mother: Yeah.

"Defendant: If you and Jodie cannot get me a good lawyer, I'm going to go do my fucking time, I'm going to sign my kids over to the State of Oregon, and you guys will never fucking see me again.

"* * * * *

"Mother: Yeah, but Roy, we have done everything that we can.

"Defendant: No. No. When I've got a different fucking lawyer, then you've done everything you can. If it was you, I would do anything.

"* * * * *

"Mother:   You cannot—you cannot let them pay the dues for all of this, Roy.

"Defendant:   Listen, I'm not taking it out on my kids. I'm not. That—I'm telling you what I'm going to do, and you can count on it. If I go to court with this fucking attorney, I'm fucked.

"* * * * *

"Mother:   I—I have done everything. And I told the investigator yesterday that we'll all give testimony.

"Defendant:   Okay. Listen. Listen. I don't care what you can't do. I don't care what you've done—what you have done. I'm telling you if I go to trial with this fucking attorney, I'm signing my kids over to the state, and I'm going to go and do my time, and then I'm going to live in Mexico. I am not going to live in America with a fucking sex beef on me at 55 years old.

"Mother:   Well Roy, we're not going to go that road because that's not going to happen.

"Defendant:   Bullshit. That is some fucking bullshit. I'm going to go to jail with this motherfucker.

"Mother:   Well, Roy, I can't (INAUDIBLE) the system.

"Defendant:   No. All I'm looking for is go find a lawyer. I don't give a fuck if it's goddamn Mr. Magoo and on his first case. I'll pay for whatever it takes when I get out of here. I can't do anything here. I cannot do anything here."

Defendant went on to suggest that his mother should sign a promissory note or a lien, or even rob a bank, to get money to hire a different lawyer for him. He ended the conversation by warning his mother that "if I go down for this, I'm turning my kids over to the state."

Upon hearing the recording, defendant's lawyer objected that "this should not come in." He insisted that the jury would conclude that defendant's derogatory comments were directed at him and that it would be extremely difficult for him to advocate for defendant in front of jurors who knew that defendant had "called [him] every name in the book" and did not believe that he was competent. In addition to those concerns, defendant's lawyer concluded by arguing that "it's unfair prejudice because it directly impedes my ability as an

attorney under the Sixth Amendment to advocate on behalf of my client."

The trial judge then offered his own view, which was that much of the recorded conversation was inadmissible and that the only part that was relevant was defendant's comment "about signing his kids over to the state if she doesn't get him another attorney." The court indicated that it was inclined to allow the state to ask defendant if he had made that statement, but to allow the jury to hear the recording if, and only if, defendant denied making the statement.

Defendant's lawyer was not satisfied with that solution. Without agreeing that even that limited portion was admissible, the lawyer suggested that, if defendant denied making the statement and the state wished to use some part of the recording to impeach him, the state should be permitted to use "a portion [that is] only about this most recent thing, that he's going to sign the kids over to the state." He noted that, even if there were grounds for using some part of the tape to impeach defendant's statements, "[t]here's no way I can be an effective advocate for my client with all that garbage on that tape." The prosecutor then suggested that she could "redo" the tape to include "just the admissible stuff" and use that for impeachment. After a fairly prolonged discussion as to what that might mean, the court generally agreed that "if you can sanitize it [to include only] the comments that he makes [that] are obviously admissible," the recording could be used to impeach defendant's statements.

Thus, as we read the transcript to this point, we understand the position of defendant, prosecution, and trial judge to be as follows:

*Defendant*: The tape was irrelevant (and, therefore, inadmissible) as impeachment on a collateral matter. The state should not be permitted to use the tape but, if it was, the permissible inquiry should be limited to an inquiry whether defendant made the one statement concerning releasing custody of his children to a state agency. Then, if defendant *denied* making the statement, the recording of the statement could be used to impeach defendant's statement in his direct testimony that he "loved his kids." If, on the other

hand, defendant *admitted* making the statement, that would be the end of the matter—defendant's admission would obviate any need for the tape.

*Prosecutor*:   The prosecutor felt that she was entitled to impeach defendant's self-serving statements respecting his love for his children and his concern for their welfare. The tape recording of defendant's threat to abandon his children to state custody was one such method of impeachment; she wished to use it. She agreed with defendant's counsel that there were parts of the tape that were inadmissible, although she did not specify which ones. She was willing to prepare a redacted transcript of the tape that would limit defendant's statements to those respecting his willingness to have his children placed with a state agency.

*The Judge*:   The trial judge, having heard the entire tape, was satisfied that significant parts of the tape were prejudicial and inadmissible. The judge was of the view, however, that the prosecutor was entitled to ask defendant if he had made the statement in question. If defendant denied doing so, the judge was prepared to admit a limited version of defendant's statement, establishing that it had been made.

It was then that things fell apart. After the jury returned, the prosecutor asked defendant whether he had "threatened to turn [his children] over to the State of Oregon if [he] didn't get [his] way." When confronted with that question, defendant acknowledged that he had made such a statement, but then attempted to explain. He stated that he believed that the state would provide his children with a "decent life," that he did not want to impose his children on his aging mother or his sister if he went to jail, and that it was "[t]hrough love for my children and ultimate care for my family [that] I said that if I go to prison I will sign my children over to the state."

At that point, the prosecutor insisted that defendant's explanation had "opened the door" to evidence that previously had been inadmissible, and asked the court's permission to play the entire conversation for the jury. When the judge indicated that he was going to grant the prosecutor's request, defendant's attorney responded:

"Judge, there is no way that I can actively represent my client. I mean, you know, he's going to make statements and he's gonna fly off and do what he wants to * * *, but if you look at [Oregon Evidence Code Rule] 403 there is no way I can represent him now. Because that tape comes in, and all he's gonna do is whine and whine and whine about his boys. I can't effectively advocate for him under those circumstances. Now his decision to open this door is incredibly unwise, but when you look at the totality of it, it's so prejudicial, judge, that I'm denied the right of being a lawyer that he's guaranteed by the Oregon Constitution and the Federal Constitution. His comments about his lawyer just take the rug out from underneath me."

The trial judge was not persuaded by defense counsel's concern and suggested that defendant had only himself to blame for any diminution in his lawyer's effectiveness. The judge explained his position:

"[Defendant] has now testified that the reason he made those statements [about signing over his children] was because he was concerned about his children [and] didn't want to burden his mother. I think that brings in the entire tape to show the context of his statements. *I think the tape as I heard it certainly indicates something other than what he's just testified to, so I think that makes the entire tape admissible. The fact that he makes derogatory statements about his attorney, while unfortunate, * * *—it's inescapable. I don't think we can avoid that at this point because it is admissible. I think that the entire tape is admissible.* * * * I realize that it makes your job harder, but I don't think it eliminates your ability to represent him. *And the fact is that if—if it's harder now for you to represent him, it's because of the things that he has done.*"

(Emphases added.) The trial judge thus overruled defense counsel's objection to admission of the recorded conversation. He also denied a motion for mistrial that defense counsel raised when it became clear that the jury would hear the entire conversation.

After the jury had heard the recorded conversation, defendant again attempted to explain. Defendant told the jury that his statements about signing his children over to the state were "the worst thing I've ever done in my life," that he had acted out of desperation, and that he "[couldn't] bear

to live without [his] kids." Later in the proceeding, he suggested that the recording did not reflect his true character: "I've been an excellent father my entire life, for 10 years now, excellent, and with one statement they're going to take it all away from me. It's not fair." In spite of his explanations and entreaties, the jury found defendant guilty of both charges.

Defendant appealed, arguing that allowing the jury to hear his denigrating statements about his attorney violated OEC 401, OEC 403, and his constitutional right to counsel under the Sixth Amendment to the United States Constitution and Article I, section 11, of the Oregon Constitution. The Court of Appeals rejected all of defendant's arguments, electing to discuss only one—defendant's contention that admission of the statements violated OEC 403—in its written opinion. With respect to that argument, the Court of Appeals held that defendant's derogatory statements were important, because defendant's credibility was directly at issue and the statements "illustrated to the jury that the context of the statements about his children was different from what defendant had portrayed in his testimony." *Knight*, 209 Or App at 572. The Court of Appeals also accepted, with little discussion, the trial judge's view that, although admission of the statements made trial counsel's job harder, it did not entirely "eliminate" counsel's ability to represent defendant. *Id.* at 572-73. Ultimately, the court concluded that the recording's potential for unfair prejudice did not outweigh its probative value, and that the trial court had not erred in admitting it or in denying defendant's motion for a mistrial. *Id.* at 573-74.

Before this court, defendant again argues that the trial court's decision to allow the jury to hear him disparage his attorney violated OEC 403 and also violated his constitutional rights to counsel and due process. As is our ordinary practice, we consider defendant's statutory argument first. Before we turn to that argument, however, we first must deal with a jurisprudential concern—the state's contention that defendant's argument, *as he now formulates it*, is not preserved.

The state begins with the assertion that, in his brief to this court, defendant argues that certain of defendant's

statements to his mother (specifically, four statements that contained derogatory references to his attorney)[1] were inadmissible, but acknowledges that other parts of the recorded conversation were admissible. The state argues that that particular objection (to those four statements) was not preserved because, before the trial court, defendant's objection was directed at the recorded conversation *as a whole*. The state contends that, under our usual preservation rules, the present, narrower objection is not preserved. The state cites *State v. Brown*, 310 Or 347, 359, 800 P2d 259 (1990) (quoting *Sproul v. Fossi*, 274 Or 749, 755, 548 P2d 970 (1976)):

> " '[W]hen evidence is offered as a whole and an objection is made to the evidence as a whole and is overruled, the trial court will ordinarily not be reversed on appeal if any portion of the offered evidence was properly admissible, despite the fact that other portions would not have been admissible had proper objections been made to such portions of the offered evidence.' "

In our view, however, the state misunderstands defense counsel's objection in the trial court when it suggests that the objection was directed only to the recording as a whole. From the beginning, defense counsel's objections to the recording were focused, *inter alia*, on defendant's derogatory comments respecting the quality of counsel's representation. Counsel specifically mentioned the difficulty of advocating in front of jurors who knew that defendant had "called him every name in the book." As our earlier summary demonstrates, the trial court initially appeared to understand and agree with defense counsel's focus: It suggested that the only part of the conversation that was relevant and admissible was defendant's comment "about signing his kids over to

---

[1] The statements are:

(1) "When I've got a different fucking lawyer, then you've done everything you can."

(2) "If I go to court with this fucking attorney, I'm fucked."

(3) "I'm telling you that if I go to trial with this fucking attorney, I'm signing my kids over to the state, and I'm going to go and do my time, and then I'm going to live in Mexico. I am not going to live in America with a fucking sex beef on me at 55 years old."

(4) "I'm going to go to jail with this motherfucker."

the state if she doesn't get him another attorney." Later, the discussion turned to the possibility of redacting inadmissible material from the tape and defense counsel agreed that that should be done because "there's no way I can be an effective advocate for my client with all that garbage on that tape." The prosecution even offered to redact the material about which counsel was objecting. In that entire exchange, defense counsel clearly was referring to defendant's derogatory comments about him.

The state acknowledges the foregoing history, but argues that, after defendant "explained" his statements, defense counsel abruptly changed gears, conceding that defendant had "opened the door" to admission of the entire recording and arguing only that he could no longer effectively advocate for his client "[b]ecause that tape comes in." But we do not read defense counsel's words as conceding the legal point, *i.e.*, that defendant had opened the door to admission of the entire recording. Rather, we read them as acknowledging the trial judge's announced course, *viz.*, that he had decided to admit the entire recording. And, while defense counsel perhaps *did* concede that defendant's explanation had opened *some* door, he continued to focus his objection on a single aspect of the recorded conversation: *"His comments about his lawyer just take the rug out from underneath me."*

What is more, it is clear that the trial judge understood defense counsel's response as continuing his previous objection to a specific kind of statement contained in the recording, *i.e.*, the derogatory statements about defendant's lawyer. The judge explained: "The fact that he makes derogatory statements about his attorney, while unfortunate, * * * it's inescapable. I don't think we can avoid that at this point because it is admissible."

When read in the context of the trial judge's comments, defense counsel's prior objections, the prosecutor's remarks, and the prior discussion about editing the recording to remove irrelevant and unfairly prejudicial material, the state's characterization of defense counsel's last objection—as dropping defendant's narrower objection to admission of his derogatory statements in favor of a broad objection to the

conversation as a whole—cannot be sustained. Defendant's objection then was the same objection that he is raising now.[2] The issue is preserved.

■      Having disposed of that preliminary issue, we turn to the merits of defendant's statutory argument—that defendant's derogatory statements about his lawyer were inadmissible under OEC 403. OEC 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

In *State v. Mayfield*, 302 Or 631, 645, 733 P2d 438 (1987), this court described how trial courts should decide whether evidence is admissible under OEC 403:

"First, the trial judge should assess the proponent's need for the * * * evidence. * * * In the second step the trial judge must determine how prejudicial the evidence is, to what extent the evidence may distract the jury from the central question whether the defendant committed the charged crime. The third step is the judicial process of balancing the prosecution's need for the evidence against the countervailing prejudicial danger of unfair prejudice, and the fourth step is for the judge to make his or her ruling to admit all the proponent's evidence, to exclude all the proponent's evidence or to admit only part of the evidence."

We first consider the state's need for the evidence. The state asserts that, although it initially sought to put the objectionable statements in evidence to impeach defendant's self-portrayal as a good parent, the real value of those statements, in the end, was to impeach defendant's overall credibility. The state contends that defendant's credibility was an especially important issue in the case, because defendant had testified that he had not sexually abused the victim and the

---

[2] To the extent that the state is arguing that defendant's objection in the trial court was insufficient to preserve his present objection because it was couched in terms of a *category* of statements (derogatory statements about defendant's lawyer) rather than a specific identification of the objectionable statements, we are unpersuaded. The concept of a "derogatory statement" is a simple one and we have every confidence that the trial judge understood what defense counsel intended, even without a particularized identification of the objectionable statements.

jury needed to evaluate the credibility of that testimony. Although the trial court never specifically articulated its analysis in those terms, it did suggest that the state was entitled to show that defendant was not speaking truthfully when he explained to the jury his reasons for telling his mother that he would sign his children over to the state. Implicit in that suggestion is a conclusion that defendant's credibility was an important issue in the case.

We agree that, once defendant testified that he had not abused the victim, his credibility became relevant. And, although we are hesitant to do so, we also shall assume—no contrary argument having been made in this case—that the four statements that defendant identifies as objectionable had some relevance to that issue, insofar as they show that defendant attempted to mislead the jury about another matter, *i.e.*, his reason for telling his mother that he would sign his children over to the state.[3] In any event, the state cannot deny that the recorded conversation impeached defendant's testimony on an issue that was—at best—not central to the state's case. Moreover, the state probably could have obtained the desired result, *i.e.*, impeachment, without using statements that directly attacked defendant's lawyer. Ultimately, the record establishes that the statements at issue, even if they had some value to the state's case, were by no means essential.

We turn to the second step in our OEC 403 analysis—assessing the danger of unfair prejudice or distraction that is inherent in the evidence at issue. Defendant contends, as he did in the trial court, that admitting his statements about his attorney would be extremely prejudicial, because the jury would assume that the statements were about trial counsel and would conclude that trial counsel was not zealously defending defendant and that defendant believed trial

---

[3] Our hesitation is due to the fact that, seen in retrospect, it appears to us that defendant's self-serving statement was a collateral matter as to which no impeachment should have been permitted at all. The alleged victim in this case was not one of defendant's children. Thus, whether or not defendant loved his own children was a red herring. Certainly, the tape was not independently relevant in the state's case. *See State v. Gibson*, 338 Or 560, 572, 113 P3d 423, 429, *cert den*, 546 US 1044 (2005) (witness may not be impeached with respect to collateral matters, *i.e.*, facts that have no independent relevance to the issues in the case).

counsel to be incompetent. The trial judge appeared to acknowledge those dangers, but he placed a fairly low value on them. He suggested that, because admitting the statements did not entirely "eliminate" defense counsel's ability to advocate for defendant, and because defendant had brought the problem on himself with his testimony, there was no real cause for concern. The Court of Appeals agreed with that assessment. *Knight*, 209 Or App at 572-73.

The state has added its own list of reasons for downplaying the degree of unfair prejudice involved in admitting defendant's statements about his lawyer. The state suggests that defendant is wrong in suggesting that jurors necessarily would infer that defendant's comments were about trial counsel and that it is "equally possible" that the jury would conclude that defendant's mother had acceded to defendant's demands and hired a new attorney to represent him at trial. The state also contends that, even if the jury *did* conclude from the statements that defendant believed that trial counsel was incompetent or that trial court was not zealously representing defendant, there was little likelihood that that conclusion would change its ultimate decision about defendant's guilt or innocence. Finally, the state suggests that, "to the extent that defendant was prejudiced [by admission of the statements], it was by his own actions."

We think that the trial court, the Court of Appeals, and the state all have vastly underestimated the level of unfair prejudice inherent in allowing the jury to hear a defendant make these kinds of statements about his lawyer. First and foremost, we emphasize that the only reasonable reading of the record is that defendant's references were to his present lawyer. We reject the state's argument that it somehow was "equally possible" that the jury would believe that all of defendant's profane diatribe was directed at some previous counsel for defendant. *This* counsel was the one whom the jury saw; the record contains no reference to any previous counsel.

We also think that it is important to note that defendant's persistent references to trial counsel as "this fucking attorney" and "this motherfucker" undoubtedly focused the

jury's attention on defendant's personal and professional conflict with trial counsel—a conflict that had no relevance to any issue before the jury. Equally importantly, hearing defendant's remarks inevitably affected the jury's own perception of the competence and zealousness of defendant's trial counsel and, ultimately, of the strength of defendant's case. After the jury heard that defendant was unimpressed with his lawyer's ability, his cause was sunk. No juror thereafter was going to view defense counsel as more credible and persuasive than the prosecuting attorney. To put the matter another way: Whether or not the foregoing effects entirely "eliminated" trial counsel's ability to represent defendant, we think that it is inescapable that they did sufficient damage to compromise defendant's constitutional right to representation and the overall fairness of defendant's trial. *Cf. In re Ochoa*, 342 Or 571, 574, 157 P3d 184 (2007) (judge's belittling and critical comments to and about a defendant's trial counsel jeopardized the defendant's right to a fair trial). In short, the record shows that the potential for unfair prejudice that attached to defendant's recorded statements was extremely high.

That brings us to the third step of the OEC 403 analysis—the balancing test. In *Mayfield*, 302 Or at 647, we indicated that "trial judges are granted broad discretion when findings are made on the record to back up this discretionary call." In the present case, however, the record is sparse in that regard. In fact, the most reasonable reading of the record is that the trial judge did not engage in a weighing process at all, but merely concluded that, because the recorded conversation contradicted defendant's sworn testimony, the jury must unavoidably hear everything in the recording, including all of defendant's derogatory remarks about his attorney.

Notably, the Court of Appeals concluded (and the dissent agrees) that the record *was* sufficient to show that the trial judge engaged in balancing and that the judge found that the probative value of defendant's derogatory statements about his attorney was not significantly outweighed by the danger of unfair prejudice. However, and even if we were to agree that the record is sufficient to suggest that the trial judge did consider the issue, we cannot agree with the Court

of Appeals (or the dissent) that the trial court's ultimate conclusion—that the statements' probative value was not outweighed by the potential for unfair prejudice—is justified by the evidence in this record. Indeed, the danger of unfair prejudice that attaches to a defendant's relentlessly profane and derogatory statements about his own lawyer is so devastating to counsel's credibility and to any defense theory that he might advance that it is difficult to imagine that such statements could *ever* be sufficiently probative to tip the balance toward admissibility under OEC 403. Certainly, the statements at issue here, which had only modest—if any—value to the state's case, are not that probative. We conclude, in other words, that, to the extent that the trial judge exercised his discretion in the present case to weigh probative value and unfair prejudice, his ultimate evaluation was an abuse of that discretion.

We turn to the final step of the trial court's task under OEC 403—the decision whether to admit or exclude the evidence altogether or to admit only part of it. Defendant contends that, if the trial court wished to permit the state to impeach defendant's "explanation" of his statements about signing his children over to the state, it should have redacted the recorded conversation to exclude the statements that explicitly refer to defendant's lawyer in a derogatory way. He contends that excluding those statements would not have significantly reduced the recording's value to impeach defendant's prior testimony because, after redacting the statements that disparaged defense counsel, it still would contain statements showing defendant's real reason for threatening to sign away his children (to induce his mother to hire an attorney for him).

As noted, the state argues that defendant did not preserve any claim that part, but not all, of the recorded conversation was inadmissible. We already have rejected that argument. 343 Or at 479-80. The state also contends that defendant's suggested redaction would render harmless any error in admitting the four derogatory statements that he focuses on. The state is wrong. On the scale of unfair prejudice, there is a world of difference between a criminal defendant's statement that he needs "*a* good lawyer" and a statement that he would be "fucked" if he went to trial with "*this* fucking lawyer."

■ We conclude that the trial court abused its discretion and, therefore, erred in failing to exclude defendant's derogatory statements about his attorney under OEC 403.[4] Because that error was prejudicial and grounds for reversal, we need not consider defendant's alternative constitutional claims.

The decision of the Court of Appeals and the judgment of the circuit court are reversed. The case is remanded to the circuit court for a new trial.

**LINDER, J.,** dissenting.

It will come as a surprise to the trial judge in this case to learn that he erred by failing to redact from the recorded conversation the four statements that the majority sets out in footnote 1 of its opinion. 343 Or at 478 n 1. The Court of Appeals will be equally surprised. Until defendant filed his petition for review with this court, defendant did not identify those four statements as ones that could be and should be selectively removed from the recording to reduce any prejudice to his defense. Defendant's objection, instead, ran to the entire recording. Defense counsel argued that there was a "huge amount of stuff" and "a lot of inadmissible material" in the recording that would reflect his client's bad opinion of him. Defense counsel identified one, and only one, way to redact the recording to make it less objectionable—by playing "a portion only" in which defendant had said he was "going to sign the kids over to the state." In defense counsel's view, the jurors should "just hear that." If they heard the rest, the "ball game" was over—he could not be an effective advocate for his client "with all that garbage" on the recording.

The majority, by its holding in this case, makes it the trial court's responsibility to sort through the garbage to decide what is admissible and what is not. That traditionally has not been, and should not be, a trial court's responsibility. If evidence is admissible in part and inadmissible in part, a party may not object to it as a whole; instead, an objecting party must identify with particularity the inadmissible parts. *See, e.g., State v. Brown,* 310 Or 347, 358-59, 800 P2d

---

[4] We emphasize that our ruling is based on a statutory source of law—the Oregon Evidence Code. We do not consider or rely upon either the Oregon or the federal constitution.

259 (1990) (objecting party has the responsibility of segregating inadmissible portions of testimony from admissible ones); *Brown v. J. C. Penney Co.*, 297 Or 695, 704-05, 688 P2d 811 (1984) (same rule for exhibits). The majority does not quarrel with that settled principle. Remarkably, however, the majority finds it satisfied here. It does so because defense counsel asserted, as his *reason* for objecting to the *entire* recording, that the recording contained derogatory statements that would make it difficult for him to advocate for his client. 343 Or at 479-80. From that much, without more, the majority asserts that it has "every confidence" that the trial court knew defense counsel wanted four specific statements redacted from the recording and defense counsel did not need to identify them with any particularity. 343 Or at 480 n 2.

I respectfully disagree. In my view, the record supports neither half of the majority's confident assertion—it does not support that defendant wanted four specific statements redacted from the recording; it does not support that the trial court would have understood that. Defendant's recorded conversation with his mother was replete with statements reflecting his dissatisfaction with his lawyer and his insistence that his mother hire a different lawyer for him. Some of the statements reflected defendant's dissatisfaction directly (*e.g.*, by calling his counsel a "motherfucker"). Others reflected his dissatisfaction indirectly (*e.g.*, by demanding that his mother get him a "good lawyer"). But in the context of the recording as a whole, the statements all had the same flavor, and defense counsel's objection encompassed them all when he argued that the recording contained a "huge amount" of derogatory statements and was full of "all that garbage." Defense counsel's obvious point was that the recording was infused with objectionable statements. The trial court expressly agreed. As a result, when the issue of the recording's admissibility first arose, the trial court ruled that no part of the recording would be admitted, except for the one portion in which defendant said he would relinquish custody of his kids to the state, which would be admissible if defendant denied making the statement.

In effect, at that point, the trial court agreed with defendant that all but a small portion of the recording was more prejudicial than probative, and would not be admitted.

There was no reason, given that ruling, for defendant to urge that the rest should be admitted only if some or all of defendant's statements about his lawyer were redacted. There was no reason, as well, for the trial court to consider redacting any of the remainder of the recording. In fact, defense counsel did not so argue, and the trial court never considered the possibility of redacting any particular derogatory statements. Later, when defendant admitted making the statement and went on to give an explanation for why he said it, one that the recorded conversation flatly belies, defense counsel agreed that the explanation opened the door to the admission of the entire conversation, which revealed defendant's real reason for making the threat. If defense counsel had in mind that the trial court should redact specific derogatory statements, defense counsel logically would have voiced any proposal to redact them at that time. But defense counsel did not do so. Instead, as the quotation set forth in the majority opinion reveals, defense counsel argued only that he could not effectively advocate for his client if "that tape comes in" because "the totality of it" made it too prejudicial. 343 Or at 476. For the trial court and the parties the issue of the recording's admissibility at that point was an all or nothing proposition. Defense counsel objected to the entire recording *because* of the derogatory statements it contained; defense counsel never suggested that there was a way to cure or minimize the prejudice by redacting those statements.[1]

---

[1] There are two reasons why the subject of redacting the derogatory statements may never have come up. First, as I have already described, no one suggested that some statements could be distinguished from others, so that only four had to be removed. Redacting them all, however, likely would have removed so much of the substance and context of the conversation as to render the recording inaccurate. *See State v. Harberts*, 315 Or 408, 417-18, 848 P2d 1187 (1993) (redaction of inadmissible matters from otherwise relevant evidence may be permitted if the meaning of what remains is not significantly altered). Second, the record suggests significant doubt whether such redaction of the conversation at the sentence or phrase level was possible. After the prosecutor offered to make an altered recording containing only the portion of defendant's statements about relinquishing custody of his kids, the prosecutor asked for clarification of her task. She asked what she was expected to do with, for example, defendant's statement, "If you don't get me a new attorney, I'm going to sign over the kids." She explained that it was hard to break up the recording to delete part of a statement like that. The trial court acknowledged the difficulty and told the prosecutor she did not have to sanitize it completely; the court was asking her only to extract the portion about signing over the kids from the rest of the conversation. Defense counsel took no issue with the prosecutor's comments about the difficulty of redacting highly select portions of the recording.

Now, for the first time on review in this court, defendant argues that four of his statements should have been redacted from the recording, and the state then could have been permitted to impeach his testimony with the rest. Aided by a written transcription of the recording that was prepared for the appeal (but was not available at trial), defendant proposes that four of the statements that directly attack his trial counsel's competence could have been redacted from the recording, and the indirect attacks could remain so that the recording retains some evidentiary value.[2] At trial, however, no such proposal was ever made. There was no written transcript that anyone could dissect with surgical precision; the trial court and the parties had only the oral recording, which was played once outside of the presence of the jury so that the trial court could rule on defendant's motion. No one parsed the conversation or defendant's statements the way that the appeal has permitted. The record simply provides no basis to conclude, as the majority does with "every confidence," that the trial court understood that defense counsel wanted the court to redact the four specific statements defendant identifies in his briefing to this court.

The issue properly before us, therefore, is not whether the trial court should have redacted the four statements from the recording before admitting it. Rather, the issue properly before us is the same one that the trial court and the Court of Appeals were asked to decide—whether the trial court abused its discretion in concluding that the recorded conversation as a whole, which included the derogatory statements, was more probative than prejudicial under OEC 403.[3]

---

[2] With the direct attacks on defendant's counsel removed, the other statements become much more benign—they appear to be mere requests for a lawyer, rather than requests for a *different* lawyer. For example, the recording would still contain: (1) defendant's threat to give custody of his kids to the state if his mother and girlfriend "cannot get me a good lawyer;" (2) his statement that he just wants to find a lawyer and doesn't care if it is "Mr. Magoo and on his first case;" and (3) his acknowledgment that the investigator on the case was on his side, but the investigator was not a lawyer. It is the written transcript, however, that makes it possible, on careful examination, to find a way to leave some statements in, while removing others.

[3] Significantly, defendant did not on appeal give the Court of Appeals the benefit of the same list of objectionable statements. Indeed, out of the 13 pages of argument in defendant's Court of Appeals brief, defendant's entire argument on

In making *that* OEC 403 assessment, the trial court did not err. As a starting point, it is worth remembering (as the majority notes as well) that trial courts are granted broad discretion in performing the necessary balancing under OEC 403, as long as they make findings to back up their discretionary call. *State v. Mayfield*, 302 Or 631, 647, 733 P2d 438 (1987). This case well illustrates the importance of the deference we give to a trial court's superior position to make the assessment that OEC 403 requires.

The first factor in the OEC balancing—the relevancy of the evidence—is readily satisfied. *See Mayfield*, 302 Or at 645 (identifying test). This was purely a credibility dispute: everything turned on whether the jury believed the victim or defendant. Defendant offered the jury only one reason to believe him—at great length and in great detail, he portrayed himself as a devoted, ethical, and sacrificing parent who would never do anything to harm his kids or those of his live-in girlfriend (*i.e.*, the victim). That defense made it relevant for the state to show that defendant was willing to callously relinquish his kids to state custody. When asked whether he made the statement, defendant readily admitted it and then, without prompting by his counsel, insisted on explaining why. The recording, by showing the context in which the statement was made, revealed the actual reason— *i.e.*, defendant told his mother explicitly that he would sign his children over to the state as a way of punishing her if she did not somehow hire a different attorney for him, despite her financial inability to do so. From the recording, the jury could conclude that the explanation defendant gave on the stand and under oath was a blatant lie, but one that continued defendant's self-portrayal as a saint-like father and family man—*i.e.*, he could not burden his aging mother or his sister

redaction was a single sentence in which defendant urged that his statements expressing his opinion about his counsel's competence "could have been redacted without changing the import of defendant's remarks about his children." Defendant was nonspecific and did not identify the four statements that he has enumerated in his briefing to this court. Defendant therefore failed to preserve the redaction issue in two ways: by not making that argument to the trial court and by not presenting that issue to the Court of Appeals. *See State v. Wyatt*, 331 Or 335, 341-47, 15 P3d 22 (2000) (court will not consider an issue not preserved before the trial court); *Tarwater v. Cupp*, 304 Or 639, 644-45, 644 n 5, 748 P2d 125 (1988) (a petitioner in this court cannot shift or change position on review and argue or raise an issue that was not before the Court of Appeals).

with the care of his children, and he was willing to turn them over to the state solely out of love for them and for the rest of his family. The fact that his real reason was extortion and self-interest directly impeached defendant on an issue he had made central to his defense. The recording was, for that reason, directly and powerfully relevant.

The second OEC 403 inquiry is the danger of "unfair prejudice" inherent in the evidence. *Mayfield*, 302 Or at 645. The majority, based on its reading of the record, concludes that the trial court placed a low value on the fact that defendant's derogatory statements might impair defense counsel's ability to represent his client effectively. I disagree. To the contrary, the trial court recognized the danger, and said so expressly. Because of that danger, the trial court initially ruled that the recording could not come in at all, except for the limited portion in which defendant said he would relinquish custody of his kids to the state (and then, only if defendant denied making the statement). The trial court admitted the evidence only after defendant insisted on giving an explanation to the jury that directly furthered his defense and that was, point blank, directly contradicted by the recording. In doing so, the trial court expressly found that defendant had brought the problem on himself, a finding that has direct bearing on the degree to which any prejudice inherent in the derogatory statements was "unfair."

The majority says little about defendant's role in bringing on the problem himself. The trial court's finding takes on particular significance, however, when viewed in the broader context of defendant's pretrial conduct before the same trial judge. Defendant's trial counsel was not the first attorney appointed to represent him. Months before the trial, his first counsel moved to withdraw because of defendant's unhappiness with his representation. The trial court was not initially satisfied that defendant had articulated an adequate basis for the court to give him substitute counsel. Defendant's first counsel, however, asked to be heard on the matter. After explaining that he was usually resilient in the face of such motions, he could not personally look past "some of the things that [defendant] has said both in telephone calls to his family and [in] letters regarding my abilities." Because of defendant's statements, defense counsel feared that he would not

zealously represent defendant and that defendant's case would be prejudiced. Counsel's representations in that regard convinced the trial court that counsel should be permitted to withdraw.

In the months that followed, defendant persistently tried to remove the next attorney appointed for him and have the court appoint one that he had identified as acceptable to him. The trial court repeatedly emphasized to defendant that he was entitled to competent counsel at public expense, not to an attorney of his choosing. Although defendant's second counsel (his eventual trial counsel) asked to withdraw because his client lacked confidence in him, the trial court denied the motion and advised defendant that the court was not going to continue appointing attorneys for defendant until defendant finally found one that he would accept. Sometime between that admonition and the scheduled trial date, defendant spoke with his mother from jail to coerce and intimidate her into retaining an attorney for him. As he had with his first attorney, defendant criticized and insulted his appointed counsel's abilities in highly derogatory terms. The recording of the conversation was the one that would later be the source of controversy at trial.

By the morning of trial, defendant's mother had retained an attorney to represent defendant, one that defendant approved of, but who would take the case only if the trial was continued. Defendant's second counsel moved for a continuance. He also moved to withdraw, both because of defendant's desire to be represented by retained counsel and because defendant and his family had made serious accusations of dishonesty against counsel. The trial court denied the motions for a continuance and for withdrawal of counsel. Defendant responded by explaining that he "desperately" needed retained counsel to represent him and that he could not go to trial with the appointed second counsel. Despite defendant's protestations, and within moments of them, the trial began.

Thus, when defendant took the stand, he had nothing to lose and possibly, in his mind, had everything to gain by admitting that he was willing to give custody of his kids to

the state, and then giving an explanation that was flatly contradicted by the recording. On the one hand, if he got away with the contradiction, it bolstered his defense. On the other, if the state introduced the entire recording to impeach him, the prejudice of his derogatory statements might well work to his benefit. Those kinds of statements had, after all, caused the trial court to permit his first attorney to withdraw; defendant was "desperate," after all, not to go to trial with his second appointed counsel.

Again, one of the reasons for giving trial courts broad discretion in applying the OEC 403 balancing test is that they are in the better position to make the exact kind of assessment that the trial court made in this case. The derogatory statements that defendant made about his attorney may have had some tendency to reduce the jury's opinion of defense counsel's skills.[4] But the trial court was in an excellent position to assess the degree to which defendant brought on that prejudice through his own conduct and choices. The trial court's finding that defendant did so should weigh heavily in the calculus, especially on this record.

The third step of the OEC 403 analysis requires balancing the probative value versus the prejudicial effect of the proffered evidence. *Mayfield*, 302 Or at 645. The majority largely dismisses the trial court's assessment, stating that "the most reasonable reading of the record is that the trial judge did not engage in a weighing process at all" and, instead, "merely concluded" that the jury "must unavoidably hear everything in the recording[.]" 343 Or at 483. The majority's analysis is constructed on a false premise. Again, the issue of redaction of select statements was never presented to the trial court. Defense counsel's objection was to the entire recording, because the derogatory statements were so pervasive and numerous. The trial court, confronted with an all or nothing choice to make, struck the balance accordingly. The

---

[4] I am far less confident of that conclusion than the majority is. It seems equally or more probable that the jurors, who can observe the attorneys and their skills throughout the trial, will make and trust their own judgments about the abilities of the defense counsel and the prosecutor (and, for that matter, the trial court). For present purposes, however, I accept that the statements pose some danger of prejudice, albeit difficult to quantify.

trial court did not abdicate its responsibility to make the needed assessment.

That leaves only the fourth and final step under OEC 403—for the trial court to make a ruling to admit all or part of the proponent's evidence. *Mayfield*, 302 Or at 645. Because defendant did not preserve an argument that the recording was admissible if four of the derogatory statements were removed, the trial court properly considered only whether to admit the recording *in toto*. In making its OEC 403 ruling, the trial court correctly exercised sound discretion and did not err.

I would affirm defendant's conviction and the decision of the Court of Appeals. I therefore respectfully dissent.

Kistler, and Walters, JJ., join in this dissent.