Argued and submitted January 21, Court of Appeals affirmed, trial court reversed and case remanded to circuit court for new trial March 3, 1987

## STATE OF OREGON,
*Petitioner on review /*
*respondent on review,*

*v.*

## JOHN EDGAR MAYFIELD,
*Respondent on review /*
*petitioner on review.*

(CC 10-84-01096; CA A32196; SC S33165, S33237)

733 P2d 438

Terry Ann Leggert, Assistant Attorney General, Salem, argued the cause for the State of Oregon. With her on the petition for review were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

Daniel N. Gordon, of Daniel N. Gordon, P.C., Eugene, argued the cause and filed the petition for review for John Edgar Mayfield.

JONES, J.

## JONES, J.

The state petitions for review of the Court of Appeals' reversal of defendant's conviction for sodomy in the first degree. The state argues that the trial court did not err in admitting testimony describing defendant's alleged sexual abuse of the alleged victim's sister, which ruling was the basis for the Court of Appeals' 5-to-4 decision reversing the trial court and remanding the case to the circuit court for a new trial. 80 Or App 305, 722 P2d 1250 (1986). We allowed review to clarify some basic concepts of relevancy.[1] We affirm the Court of Appeals.

Defendant was indicted for sodomizing Kristina, the eight-year-old daughter of his then fiancee, Katherine, between March 18 and June 18, 1983. In March 1983, Kristina, her mother, her three-year-old sister, her newborn brother and defendant moved into an apartment. The alleged victim's mother and defendant were the parents of the infant brother, Brian. The relationship between defendant and his fiancee deteriorated after the boy was born and, on June 18, 1983, defendant moved out of the apartment.

In his opening statement at trial, defense counsel outlined defendant's main line of defense. Defendant's theory was that the mother and Kristina concocted the story of sexual abuse of the eight-year-old by defendant in order to deny him visitation privileges of the infant boy and to keep him from ever seeing that child again. Defense counsel told the jury:

> "John moved out at Katherine's request, this was the day before Father's Day of 1983, that would make it June 18 and 19, I believe, and he moved out because Katherine gave him a letter asking him to move out. * * * Katherine prevented John from seeing his son, Brian. In fact, the evidence will show that Katherine had two other children[,] * * * Stacey and Kristina, and those children are by two different fathers and Katherine has prevented the fathers of those children from seeing them. Apparently after she had the child she wants nothing more to do with the father.

---

[1] In his petition for review, defendant contends that the trial court should have granted his motion for acquittal, which was based on the state's failure to elect a single act of sodomy to rely upon for conviction. The Court of Appeals found that issue to be without merit. We agree.

"Well, she tried to prevent John from seeing her son and John went as far as in December of 1983 to file a legal action to gain visitation rights, to make a court make her give him visitation rights.

"It is our contention that the evidence will indicate that, basically, Katherine has arranged this in order to prevent Mr. Mayfield from ever seeing Brian again."

We detail the defense theory because the state claims that the defense opened the evidentiary door for testimony offered by the state that otherwise would have been irrelevant. In evaluating the evidence offered by the state, it should be kept in mind that defendant based his case on the accusation that the mother and, for that matter, eight-year-old Kristina, conspired in December 1983 to fabricate a story to exclude him from visitation and custody of the infant son.

Kristina, the eight-year-old, testified at the trial during the state's case-in-chief that while defendant was living at the apartment he had forced her to engage in sexual intercourse and oral and anal sodomy. She testified that defendant threatened that she would never see her mother again if she told anyone. On cross-examination she admitted that in September 1983, during an interview with a Children's Services Division (CSD) caseworker named Routzahn, she denied that defendant had ever sexually abused her. On redirect examination Kristina explained to the jury that she had denied any sexual abuse by defendant when she was talking to the caseworker because she feared that she would not see her mother again if she accused defendant of abusing her.

To this juncture of the trial, the child's testimony had been restricted by the prosecution solely to prove the sexual abuse of Kristina. However, the prosecutor elected to press for the admission of evidence of uncharged misconduct by defendant toward Kristina's three-year-old sister, Stacey. The prosecutor argued to the court outside the presence of the jury as follows:

"I would submit that we should be able to develop the fact that the reason that she was being questioned by Children's Services Division authorities was the fact that they were investigating sexual misconduct between this Defendant and a sibling.

"I can tell you that the evidence is basically as follows:

That during mid-June of 1983 Katherine, the victim's mother, while she was living with the Defendant went to change the three-year-old sibling, change her diaper. When she did that she noted that the rectum of the three-year-old sibling was bloody and appeared to be torn.

"She inquired of the three-year-old sibling what had happened and she said 'Daddy doctor' had done that to her. That was ultimately reported to CSD workers and the CSD workers followed up on that and questioned the victim in this particular case.

"As a second alternative theory for the admissibility of this evidence or related evidence, I can represent to you that the victim is prepared to testify that, basically, the reason why she did not report what had occurred between she and the Defendant when initially questioned by CSD authorities, was that she was frightened that she would be taken away from her mother if she did so.

"And, secondly, that the Defendant at that time was out of her home and was no longer posing a threat to her. Two, three, maybe four months later she observed a document or heard about a document that had been served upon her mother which the Defendant was seeking, either visitation rights or custody rights of the victim's infant brother.

"She decided to report what had occurred between she and the Defendant at that point because she was concerned that the same thing would happen to her brother that had happened to she and her sister. She was familiar with what had happened to her sister and the evidence relating to that. She had, also, observed firsthand an incident of sexual abuse between the Defendant and the three-year-old sister.

"* * * * *

"We are not offering this evidence to blacken the character of the Defendant. We are not offering it to prove that because he molested or possibly molested this three-year-old [i]t is more likely he molested this particular victim. We are offering it to show two things: First of all, to complete the picture as to why she was being questioned by CSD authorities and her mother and her grandmother and Springfield Police Department authorities in August of 1983, as the evidence indicates now. And the second reason is to explain, first of all, her motivations for denying that any sexual contact had occurred in August, and, then, her motivations for ultimately reporting it."

The court then commenced to evaluate whether this evidence

was relevant and, if so, whether its prejudicial effect substantially outweighed its probative value. *See* OEC 403.[2] The court stated:

> "Well, if the jury is wondering why a CSD worker or an officer in August of that year is interviewing Kristina, I think State's interest and motivation in explaining why that is being done, at that time, in order to do so has to show evidence of other sexual contact with a younger sibling.
>
> "On a balancing test State's interest would lose because it is highly prejudicial. State's interest in explaining why the youngster is being interviewed, at that time, falls by the wayside in comparison with the prejudicial effect of showing that in this case.
>
> "More serious concern to the Court is the jury's possible concern and wonderment at why Kristina has told two different versions. One involving the Defendant in her testimony, here, and one excluding the Defendant during those earlier interviews. That is a more vital interest to the State, it seems to me in giving explanation of why that is the case. It comes more closely in on favorable admissibility on a balancing test on any motives that could explain why she is being interviewed, at all."

The court continued to mull over the problem, commenting:

> "In the usual case where it has been shown to the jury that a witness made a different statement at a different time, the witness is permitted, at that time, to explain that inconsistency. Doesn't have to wait until rebuttal to explain it, but I — I don't know. When you have something that's highly prejudicial and the Court is involved maybe in a balancing test, I'm not sure that a crack in the door is the same as the door wide open."

After a brief recess, the trial judge ruled:

> "* * * Court is of the opinion that key and essential to the issues being present to this jury, the very gist of the issue whether the Defendant did the acts alleged in the Indictment or did not do, the only direct evidence that he did apparently is going to come from the testimony of Kristina, the alleged

---

[2] OEC 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

victim, and her powers of observation, her memory, her honesty, truth and veracity are essential to the determination of the case or the resolution of it by the jury if her testimony or version of it, or any part of it, is disputed. And it has been shown that in August of * * * '83, in an interview concerning it she did not involve anyone, did not have anyone. As a matter of fact, as I recall, whereas several months later her position was different, did involve the Defendant and does now in this trial.

"* * * * *

"* * * [B]ut reading these cases I hope closely, at least the rationale of them, they don't limit the State to what it must prove by way of an element of crime, but by what it is entitled to prove.

"And it would seem that it is entitled to prove that its prosecutrix adds veracity where that veracity was seriously challenged, and particularly in a case where that may be the very key to the jury determination as to whether the Defendant is guilty or not guilty.

"* * * [I]t seems to me if we are going to go into that then that will be the ruling of the Court. It is admissible. * * *

"And it seems to me what the jury ought to be told that her testimony in regard to any other alleged or supposed sexual acts by the Defendant is not to be construed by the jury as to the truth of any such other act or occurrence, but only as to what her belief was and her frame of mind was at the time she was interviewed in August of 1983 and what bearing it may have, if any, upon her giving a version at that time different from later versions of her testimony, yesterday.

"And furthermore, that that evidence cannot be used as any direct evidence of the Defendant's guilt in the crime charged in this indictment."

Defense counsel then stated his objection as follows:

"Well, obviously, your Honor, for the record I object. I object. I object."

The court responded:

"Certainly. Let me say I don't feel good. I don't feel good. I don't feel good, but there is no button here where I can abstain."

Defendant then asked that the court restrict the testimony so as to leave out the reference to the sister:

"* * * I object because I don't see the necessity of bringing in the other crimes because merely to say, 'Well, he did it to me and he did it to Stacey, so I was afraid for Brian', it makes it no more credible than 'He did it to me and I was afraid, you know, he did it to me and — okay, he went, he left me alone, and now I see he is trying to get visitation with Brian and I was afraid he would do the same thing to Brian as he did to me'. I don't see the necessity of bringing in any other crime evidence to make it plausible and to explain it and it is true. What she is saying is true and she is not lying. She is just leaving out the part about her sister."

The court concluded:

"I think * * * the State * * * is * * * entitled to show this jury for what it is worth to this jury, why she told different stories and what was going on in her mind on those different occasions."

Thereafter, Kristina testified before the jury that after talking to the caseworker she learned that defendant was seeking to gain custody of her little brother, so she decided to tell her mother about defendant sexually abusing her. She stated that she made this decision because defendant had abused not only herself, but her little three-year-old sister and she feared he would also abuse her infant brother. This testimony appears in the transcript as follows:

"Q. Now, you told us when you were first questioned by Pat Routzahn you didn't tell her what had happened to you; do you remember telling us about that yesterday?

"A. Um-hum. (Affirmative)

"Q. What made you finally tell what was going on between you and Mr. Mayfield, John, when he was living with you?

"A. Would you repeat the question please?

"Q. Okay, what made you finally tell — who is the first person you told what was going on between you and John?

"A. My mom, in a letter.

"Q. Okay, what made you decide to tell her? Something happened that made you decide to tell her?

"A. Mom received some papers and it said that John was trying to get custody of [Brian].

"Q. Were you worried about that?

"A. Yes.

"Q.  Why were you worried?

"A.  I didn't want him to get abused.

"Q.  What made you think that he would be abused?

"A.  Because me and my sister were abused.

"* * * * *

"Q.  Did you ever see Stacey and John together when Stacey was abused? Did you see that happen with your own eyes on one occasion?

"A.  Yes.

"* * * * *

"Q.  Just tell us what you saw happen.

"A.  Stacey holding John's penis."

■     Defense counsel objected to this evidence on the ground that it was not relevant. Relevant evidence "means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OEC 401. This evidence was relevant to explain why she finally told her mother about the sexual assault to herself, that is, when she heard that defendant was trying to get custody of the infant boy and she did not want him to be abused in the same fashion that she and her sister had been abused. That testimony was logically relevant to Kristina's credibility but, as we shall demonstrate, not necessarily admissible.

The prosecutor, not content with this presentation, continued questioning Kristina on redirect examination before the jury:

"Q.  Now, were you made aware of something else that made you think that John had abused your sister, Stacey, that you didn't see firsthand, but that somebody else told you about?

"[DEFENSE ATTORNEY]:  I am going to object to that, your Honor, on hearsay grounds and relevancy grounds.

"* * * * *

"THE COURT:  I will overrule that objection, and the jury may hear this only with the limited purpose of what may have been on the mind of this youngster and not for any purpose as to the truth that something else happened, or whether

it may bear on the guiltiness of the Defendant, but only on the mind of the witness."

By this comment, the trial judge apparently attempted to tell the jurors that what they were about to hear would not be any proof that this defendant anally sodomized the three-year-old sister, but could be considered by the jury only for the purpose of explaining what motivated Kristina's report of the sexual abuse of herself and her sister to her mother.

The prosecutor continued:

"Q.   Who told you about that?

"A.   Mom.

"* * * * *

"Q.   What did she say was wrong with Stacey that she saw when she changed Stacey's diaper?

"A.   Her bottom was all torn up.

"* * * * *

"Q.   Did she tell you what Stacey had said about that?

"[DEFENSE ATTORNEY]:   I am going to object to that, your Honor. Again, one on hearsay. In fact, it is double hearsay and, two, I believe the prejudicial value would outweigh any probative effect.

"THE COURT:   Same ruling, the objection is overruled and it will be heard by the jury under the same special limited."

We infer from this cryptic comment that the trial judge now told the jurors that what they just heard was no proof that defendant tore up the three-year-old's rectum, but the evidence was only relevant to Kristina's state of mind.

After the second objection was overruled, the prosecutor, having brought in the above out-of-court statement of the mother, again asked Kristina what three-year-old Stacey said to the mother with a graphic and leading question:

"Q.   * * * Did your mom tell you whether she had questioned Stacey about what had caused the injuries to her bottom, the fact that her bottom was ripped and she was bloody down there. Did she tell you whether she asked Stacey what happened?

"A.   Yes.

"Q. Okay, and what did Stacey say according to your mom, from your memory about who had caused that?

"A. She said that 'Daddy doctor' did it."

On the surface, the testimony offered by the state would appear to be hearsay evidence. Hearsay evidence is evidence of a statement, in this case an oral statement, made out of court offered in court to prove the truth of the matter asserted. *See* OEC 801(1)-(3).

One of the first inquiries in evaluating a hearsay objection is whether the proffered testimony is offered to prove the truth of the matter asserted. If the prosecution was offering this evidence to prove that defendant had sexually abused Stacey to the extent that her "bottom was all torn up," the objection should have been sustained on hearsay grounds. However, this evidence supposedly was not offered to prove that defendant had sexually assaulted Stacey, but was offered to prove that Kristina was aware that a claim had been made that defendant had sexually abused Stacey.

■     From a purely technical point of view, the hearsay objection was not well taken. McCormick on Evidence 587, § 248 (2d ed 1972), maintains that if testimony in court of out-of-court statements offered for a non-hearsay purpose, *e.g.,* to prove knowledge or that the words motivated a person to do something, requires the person testifying to repeat "definite complaints of a particular crime by the accused, this is so likely to be misused by the jury as evidence of the fact asserted that it should be excluded as hearsay." That may be one approach, but we believe that when the nonhearsay statements reach this level they should not be converted from non-hearsay to hearsay, but should be excluded under the relevancy balancing test set forth in OEC 403.

■     In this case, defense counsel protected the record by objecting not only on hearsay grounds but also on the grounds that the state's evidence was not relevant. The evidence of what the mother told the child was in addition to what the child already knew and focused graphically on Stacey's abuse and not on the knowledge of Kristina. It had no relevancy to the state's theory that Kristina told her mother about the sexual abuse to herself and her sister. This evidence came from the opposite direction, that is, what the mother told Kristina.

Arguably, the evidence was relevant to prove that the mother claimed to know of the abuse to Stacey months before the visitation issue arose in December 1983 and was of some relevance to discount defendant's contention that the mother fabricated this sexual abuse story in December to deny him visitation. However, the jury was never instructed by the trial judge that this evidence was to be considered on this limited basis.

The prosecutor, having been given the opening by the court, proceeded to try the uncharged misconduct case of abuse of Stacey to the hilt. He offered the testimony of the CSD worker as to her interview with the three-year-old sister, Stacey:

"Q [by the prosecutor]: Who was present during the time you interviewed Stacey?

"A. Just Stacey and myself.

"Q. Did you use the anatomically-correct dolls during the course of that interview?

"A. Yes, I did.

"Q. Was she able to relate certain things to you about facts that occurred between she and the Defendant in this case, or someone that she referred to as 'Daddy John'?

"A. She made very few verbal references, however in using the dolls, yes, she made quite a few.

"Q. How old was she?

"* * * * *

"A. * * * [T]hree years old * * *.

"* * * * *

"Q. In essence, what specific acts was she able to show you that had been engaged in between she and the Defendant?

"[DEFENSE COUNSEL]: Objection, relevancy.

"THE COURT: The objection is overruled.

"A. * * * [T]he first thing she did was press the two dolls close together in a standing position. * * * She wasn't communicating verbally and I finally asked her if the daddy doll was huggy and kissy the Stacey doll and she sort of shook her head, yes; that was an affirmative answer.

"And, then, I asked her to show me what else the doll did. At that point she had the male doll at the vaginal point of the

female doll and turned the doll around and put the penis next to the buttocks area and she did use the word 'peepee' for the penis.

"I tried to question her as to her words for female body parts and she just didn't have any.

"As the interview progressed she continually manipulated the male penis with her hand and seemed really fascinated with it, sort of bounced it up and down with her fingers."

■ The trial at this point had disintegrated from a sex abuse case involving Kristina to what in effect became a case of sex abuse by defendant involving three-year-old Stacey. This evidence from the caseworker about Stacey's conduct was classic nonverbal hearsay. OEC 801(1) classifies hearsay statements as "(a) An oral or written assertion; or (b) Nonverbal conduct of a person, if intended as an assertion." The child's manipulation of the dolls was clearly equivalent to a verbal assertion and should have been regarded as a statement. It was offered to prove that Stacey had been abused and was not limited to the state of mind of Kristina or the mother because neither was told of these details. Also, this evidence did not bolster Kristina's credibility because Kristina was never told about Stacey's interview with the CSD caseworker and her gestures with the dolls. However, this evidence may have had some minimal relevance to counteract the defense theory that the mother had fabricated the sex abuse story and that it tended to prove that the abuse was real and not a contrivance or figment of her imagination. Even if we assume that a jury could follow such an obtuse inference, once again the jury was given no limiting instruction on how it should utilize this evidence.

■ The prosecutor then concluded the testimony with the caseworker by asking her opinion whether Stacey exhibited signs of a sexually abused child and the caseworker was allowed to opine that Stacey had been both raped and sodomized:

"Q.  Did she exhibit some of the signs of an abused child?

"A.  Definitely.

"* * * * *

"Q.  And, then, you met with [the mother]; isn't that true?

"A. Yes.

"Q. What did you tell [the mother] your opinion was, as far as what had happened between the Defendant and Stacey?

"A. My opinion was that Stacey had been both raped and sodomized.

"Q. And presumably this interview occurred where?

"A. In the office at CSD."

This opinion was inadmissible. However, defense counsel failed to make specific objection to it, relying on his continuing relevancy objection. *See State v. Middleton,* 294 Or 427, 657 P2d 1215 (1983). All of the quoted testimony was offered by the state and received to demonstrate that the mother had been informed that both children had been abused and, therefore, there would be little motive to use the eight-year-old as a ploy to fabricate a criminal charge of sexual abuse as contended by defendant. Further, this available potential evidence tended to discount defendant's theory that the mother and Kristina fabricated the sex abuse story to deny him the right to visit Brian or to keep him from ever seeing the boy again.

■ From a theoretical point of view, almost all the above-quoted evidence tended to rebut the defense theory that the mother and Kristina fabricated the story of sex abuse by defendant and therefore possessed some logical relevance under OEC 401. When a trial judge finds logical relevance of the evidence, as he did here, the judge finds that the item of evidence increases or decreases the probability of the existence of a material fact in the case. However, a finding of logical relevance of uncharged misconduct evidence does not guarantee its admission. Evidence law demands not only logical relevance but also that the probative value of the evidence not be substantially outweighed by the danger of unfair prejudice as set forth in OEC 403. Evidence is prejudicial under OEC 403 if it tempts the jury to decide the case on an improper basis, that is, because the uncharged misconduct evidence might invite the jury to convict the defendant because he is a bad person or a person with a propensity to commit sex abuse on children or, in this case, that defendant sexually abused not only eight-year-old Kristina but also her three-year-old sister Stacey.

■        From a procedural point of view, the proponent of such uncharged misconduct evidence, in this case the state, must convince the court that the evidence not only is logically relevant but also that its probative value is not substantially outweighed by any attendant danger of unfair prejudice. The judge errs if the judge fails to exercise discretion, refuses to exercise discretion or fails to make a record which reflects an exercise of discretion. *See State v. Johns,* 301 Or 535, 725 P2d 312 (1986).

■        In making this decision under OEC 403, the judge should engage in four steps. First, the trial judge should assess the proponent's need for the uncharged misconduct evidence. In other words, the judge should analyze the quantum of probative value of the evidence and consider the weight or strength of the evidence. In the second step the trial judge must determine how prejudicial the evidence is, to what extent the evidence may distract the jury from the central question whether the defendant committed the charged crime. The third step is the judicial process of balancing the prosecution's need for the evidence against the countervailing prejudicial danger of unfair prejudice, and the fourth step is for the judge to make his or her ruling to admit all the proponent's evidence, to exclude all the proponent's evidence or to admit only part of the evidence. *See* Imwinkelreid, Uncharged Misconduct §§ 8.01-8.03 (1984).

■        From our review of the record and as manifested by the colloquy quoted above, it is apparent that the trial judge agonized over each of these factors but somehow felt obliged to admit all the evidence. His comment in ruling on admissibility demonstrated that he felt locked in to admitting the evidence, stating, "Let me say I don't feel good. I don't feel good. I don't feel good, but there is no button here where I can abstain." The button was there in the form of OEC 403, requiring application of the four factors we have just listed in applying OEC 403 to uncharged misconduct evidence of this nature. The veteran trial judge should have followed what his judicial nose was signaling to him, that is to have excluded the uncharged misconduct evidence.

        In applying these four steps to this case, the state failed to demonstrate the need for the uncharged misconduct evidence. The state was allowed to rehabilitate Kristina's

credibility by her explanation why she first denied the abuse and why she subsequently reported it to her mother. The evidence that her sister had also been abused added little to her reason for reporting the abuse. In other words, she would have reported the abuse whether it was solely to herself or to herself and her sister.

The second step is for the trial judge to determine how prejudicial the evidence is in distracting the jury from the central question, whether defendant committed the charged crime. Here, the evidence was highly prejudicial; in fact, the state was able to prove a case of sexual abuse involving Stacey against defendant that it could not have proven had he been formally charged and tried for Stacey's alleged abuse. In accordance with the rules we set down in *State v. Campbell,* 299 Or 633, 705 P2d 694 (1985), if he were charged with abusing Stacey, he first would have the right to confront and cross-examine the child if the child was available, called as a witness and competent to testify. The court would be required to determine the child's competency to testify. If the child was not available or not competent to testify, any out-of-court statements by the child relating to abuse would be limited to the complaint of abuse in the child's terms but would not include the time, the place or the identity of the abuser. In this case, Stacey's out-of-court statement identified the accused. In addition, the caseworker was allowed to render an inadmissible opinion that Stacey had been raped and sodomized. Finally, the evidence about the abuse was no mere touching but involved tearing and bleeding of the three-year-old child's rectum. We cannot conceive that a jury would not be substantially distracted from Kristina's abuse to that of Stacey's.

The third step is for the trial judge to balance the prosecution's need for the evidence against the countervailing probative danger of unfair prejudice. In step two we stated that the uncharged misconduct evidence was clearly prejudicial. As to step three, we hold that the relevance of the evidence proffered by the state, though possessing some logical relevance, was so low when compared to its prejudicial effect that it should have been excluded as a matter of law. It does not necessarily follow that the greater probative value the less the prejudice, or vice versa. *See State v. Johns, supra; State v. Gailey,* 301 Or 563, 725 P2d 328 (1986). Probative value and

prejudice exist independently. The judge must engage in a balancing process which in this case the trial judge commenced but ultimately failed to exercise. In this state trial judges are granted broad discretion when findings are made on the record to back up this discretionary call. *Id.* However, in this case the record is insufficient to justify the ultimate decision of the trial judge.

The fourth step is for the trial judge to make a ruling to admit all the evidence, to exclude it all or to admit part of it. If admitted for a limited purpose, the court should give an appropriate limiting instruction to the jury. Here the defense attorney first specifically requested the trial court to prevent any reference to Stacey's abuse. This request was denied, and Kristina was allowed to refer to Stacey's abuse when referring to her own. The evidence of uncharged misconduct by defendant of Stacey should have been cut off by the court before it was first mentioned by Kristina as part of her reason for telling her mother about the abuse. Having lost that battle, defense counsel attempted to curtail further inquiry into the uncharged misconduct evidence, but the court permitted the state to bring in all the out-of-court statements, direct evidence of abuse and inadmissible opinion evidence. In doing so the trial court erred, and the error was prejudicial, requiring reversal of the judgment of conviction.

The Court of Appeals is affirmed, the trial court is reversed and the case is remanded to the circuit court for a new trial.