Argued and submitted December 4, 2008, affirmed September 9, appellant's petition for reconsideration filed October 6 allowed by opinion November 25, 2009

See 232 Or 266, _____ P3d _____ (2009)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

RUSSELL PATRICK BORCK,
*Defendant-Appellant.*

Yamhill County Circuit Court
CR050689; A134423

216 P3d 915

Jason E. Thompson argued the cause for appellant. With him on the brief was Ferder Casebeer French & Thompson, LLP.

Anna M. Joyce, Assistant Attorney General, argued the cause for respondent. On the brief were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Kaye E. McDonald, Senior Assistant Attorney General.

Before Haselton, Presiding Judge, and Rosenblum, Judge, and Sercombe, Judge.

HASELTON, P. J.

**HASELTON, P. J.**

Defendant appeals from a judgment of conviction for three counts of first-degree sexual abuse, ORS 163.427, three counts of endangering the welfare of a minor, ORS 163.575, and three counts of harassment, ORS 166.065. Defendant raises multiple assignments of error, challenging (1) the trial court's admission of letters that defendant wrote to his niece and her mother to show defendant's intent, motive, and absence of mistake or accident in touching his step-niece's breasts and buttocks; (2) the trial court's denial of defendant's demurrer based on defendant's contention that the "touching of breasts" and "touching of buttocks" do not constitute "sexual conduct" under the statute defining that term for purposes of ORS 163.575; (3) the court's denial of defendant's motion for judgment of acquittal based on the same contention raised in defendant's demurrer; (4) the trial court's instruction to the jury on "reasonable doubt"; and, finally, (5) the nonunanimous guilty verdicts on three of the counts. We reject without discussion defendant's second through fifth assignments of error and, as explained below, conclude that the letters that defendant wrote to his niece and her mother were properly admitted as evidence of defendant's "motive" with respect to the three counts of endangering the welfare of a minor. Accordingly, we affirm.

For purposes of our review of the admission of the letters, the following circumstances and testimony at trial are material. On the afternoon of August 28, 2005, defendant visited his half-sister and her family. At the time, the family consisted of mother (defendant's half-sister); father; J and K, mother's daughters from a previous marriage, 12 and nine years old, respectively; M, father's 11-year-old daughter from a previous marriage; and S, a four-year-old daughter of the couple's present marriage.

Both M and J testified at trial. M's version of the facts was as follows: When defendant arrived at the girls' home that afternoon, M, K, and S were swimming while J was helping mother make dinner. After the family had dinner, M and J took showers and returned to their shared bedroom. While M was behind the bedroom door preparing to

get dressed, defendant, without knocking, stuck his head in the room, looked at M, and gave her "a little smirk." J and M told defendant to "get out," but defendant did not leave the room until M attempted to shut the door while defendant's head was still in the doorway.

Later, notwithstanding M's protests, defendant picked out M's school clothes for the next day, including her bra and underwear. Defendant also took pictures of the girls' "butts" and "butt cracks" and then deleted them. Defendant told the girls that, if they did not let him take pictures of them, "he would come back when [they] were asleep and take pictures of [them]."

At some point, defendant showed M a condom from his wallet and told her "you will need this later." Defendant also told the girls that he had had sex with his girlfriend three times previously that day. Defendant tried to guess M's and J's breast size and asked to touch J's breasts, but she refused. At one point, defendant sat behind M on the bed while she was on the floor and began massaging M's shoulders. Defendant told M that he was "really good at giving back rubs" and that "sometimes when he gives girls back rubs and when he touches their breasts, * * * they get orgasms." M told defendant to stop more than once before defendant ceased massaging her.

According to M, defendant physically touched her several times. While M was reaching up onto the top bunk bed to grab something, defendant pulled down her pants two to three inches, causing M's underwear to come down. Defendant later swatted M's buttocks as she and J were both walking out of their bedroom. Defendant also grabbed M's breasts two or three times.[1] The first touching occurred when M was sitting on the floor, and defendant was lying on the bed behind her. Defendant reached over after he started massaging her shoulders and grabbed M's breasts with both hands and then let go. The second touching occurred when M was preparing to stand up from the floor, and defendant grabbed

---

[1] At times, M stated that defendant grabbed her breasts "two times," but ultimately described three separate incidents.

and squeezed her breasts with both hands from behind. The third touching occurred when M was standing in front of the mirror; defendant stood behind M, reached over her shoulders, and grabbed her breasts.

J's testimony added to, or differed from, M's testimony as follows: According to J, defendant took pictures not only of M's "butt," but also "down her shirt" and "up her shorts." J observed defendant "pull[ ] [M's] pants like down to her knees and her underwear almost came down." J confirmed that she saw defendant "slap[ ] [M] on the bottom" but saw defendant "grab[ ]" M's breasts twice, not three times. Each time defendant grabbed M's breast, he "twist[ed] it" "really quick" and said "[t]hat's pay back."

J also testified that, when defendant told the girls that he "wanted to judge [their] breast size," she refused and put her arm over her chest. According to J, defendant pulled J's arm back to make her shirt tighter while looking at her breasts. Defendant also told the girls that "he likes girls with smaller breasts that could fit into his hand" and that "he knew girls that had orgasms when you lick the nipples a certain way."

Father testified that, at some point after dinner, he overheard defendant make an inappropriate comment about orgasms to M and J, and he "escorted" defendant from the house "[b]ecause a[n] 11 and 12 year old shouldn't be subjected to somebody talking about orgasms." After forcing defendant to leave, father asked the girls what had happened. M told father that defendant

"touched her butt, kind of pulled down her pants * * * a little bit when she was getting up on the bunk bed to try to get her purse or something off the top bunk, that he exposed part of her butt.

"That he had touched one or both of her breasts at a given time during the course of the hour and a half, two hours he was there. That she was sitting down on the bed or on the floor or somehow rather or other he had basically pulled her over to sit her on his lap."

J confirmed that she had observed those events. Those disclosures led father to call 9-1-1, and Deputy Harrell from the Yamhill County Sheriff's Office responded.

M gave a condensed report of the events of the afternoon to Harrell. M later gave a more detailed report to Detective Steele from the Yamhill County Sheriff's Office that largely reiterated what she had told Harrell.

Steele also interviewed defendant. Defendant admitted that he told the girls that "some girls [have] orgasms when [they] get their nipples stimulated," and that he walked into the bedroom while M was changing, but maintained that "he didn't see anything." Defendant denied showing the girls a condom and claimed that "they must have been looking inside his wallet." Defendant said that he did not think he told the girls that they would need a condom later.

As to discussing breast size with the girls, defendant explained that there was a Victoria's Secret bag in the room, and that he asked the girls who had the "expensive stuff." According to defendant, J showed him a Victoria's Secret bra, and he told her it "looks kind of small for you." J then asked defendant why he would say that, and defendant indicated that he was a "good judge of breast size."

Defendant denied intentionally taking pictures of the girls' buttocks or up M's shirt. According to defendant, the camera had a three-second delay and the girls were moving when he was trying to take the pictures, which resulted in some pictures of the girls' backsides. Defendant maintained that the camera lacked a memory card so that he could take only one photo at a time and had to delete it before he could take another.

Regarding any physical contact, defendant maintained that he and M "were wrestling" and involved in "horseplay." Defendant told Steele during the police interview that he would "grab the girls around the upper body while he stood behind them, and that he would at times take them to the ground and * * * tickle them." Defendant admitted that he "could have felt [M]'s breasts" during the horseplay and that "it could have happened, I just don't remember

it. * * * I can see how it could have happened." He acknowledged that M "could have thought she was touched by me when we were wrestling and playing around." Regarding M's buttocks, defendant maintained that he did not remember pulling M's pants down, but "probably did smack her on the butt."

Defendant was charged by indictment with three counts of first-degree sexual abuse for touching the breasts and buttocks of M;[2] three counts of endangering the welfare of a minor for knowingly inducing, causing, or permitting J to witness defendant's aforementioned sexual conduct;[3] and four counts of harassment committed by subjecting M, J, and K to offensive physical conduct.[4]

Defendant's theory at trial was that his touching of M was innocent and constituted "horseplay." Defendant contended that he and the children were "having a good time" and "playing around." Defendant noted that he never asked the girls to touch him and that he never had an erection in the children's presence. Defendant contended that the circumstances at the girls' home were "not conducive to sexual

---

[2] ORS 163.427 provides, in part:

"(1) A person commits the crime of sexual abuse in the first degree when that person:

"(a) Subjects another person to sexual contact and:

"(A) The victim is less than 14 years of age[.]"

[3] ORS 163.575 provides, in part:

"(1) A person commits the crime of endangering the welfare of a minor if the person knowingly:

"(a) Induces, causes or permits an unmarried person under 18 years of age to witness an act of sexual conduct * * * as defined by ORS 167.060[.]"

In turn, "sexual conduct" is defined as

"human masturbation, sexual intercourse, or any touching of the genitals, pubic areas or buttocks of the human male or female, or the breasts of the female, whether alone or between members of the same or opposite sex or between humans and animals in an act of apparent sexual stimulation or gratification."

ORS 167.060(10).

[4] ORS 166.065 provides, in part:

"(1) A person commits the crime of harassment if the person intentionally:

"(a) Harasses or annoys another person by:

"(A) Subjecting such other person to offensive physical contact[.]"

abuse"—both girls were together all the time, it was light outside, defendant never showed any signs of arousal, and defendant never asked the girls to keep anything from their parents.

To counter defendant's claim that his touching of *M* was innocent, the state sought admission of a number of letters that defendant had written to both *J* (and mother) while he was incarcerated on a prior conviction. Those letters and the bases upon which the trial court admitted them into evidence are the focus of our analysis. Accordingly, we recount those matters in detail.

Defendant first began writing his niece *J* when she was 11 years old, apparently in response to a letter that mother sent defendant enclosing pictures of the children. The subject of defendant's letters to *J* gradually shifted from somewhat benign content to explicitly sexual matters. For example, as the correspondence continued, defendant asked *J* what she had done with a boy and how far she had gone: "kissing? more th[an] kissing? are you still a virgin?" Defendant inquired as to how *J* dressed, what size bra she wore, and what type of underwear she wore, "pant[ies]? Thongs? G-strings? low cut?" He also suggested that the two go camping alone sometime so they could "get to know each other Better or something." Defendant threatened to "run * * * off" any boys that *J* was "suckin any face" with and to "plant a Foot in [the] ass" of any boy who was "not treating [J] good."

Much of the content of the letters centered on defendant's requests that *J* send him photographs of herself. Defendant told *J* that the correctional facility rules prohibited her from sending photographs of her "[nipples], Pubic Hair, Vagina, or Butt Hole," and forbade pictures of "Sexual acts," but that she could wear a "Bikini" or a "G-string." Defendant inquired as to whether *J* would send him photos of her in her "Bathing [suit]," in her "underwear" and "bra," "in a bubble Bath Covered By Bubbles," with her best friend and photos of just her best friend. In a letter to mother, he asked mother to buy *J* a camera so that she could take photos of herself and send them to him.

Defendant also asked J how old M was and to "tell her I said Hi." He asked J about her "best friend," inquiring how old she was, if she talked to J about defendant, and, if so, "what [does] she think about me?" He also inquired as to what J's best friend looked like and asked J to describe the friend's eye color, hair color, height, and weight, "and anything else you can think of."

Before trial, defendant moved *in limine* to exclude the letters. Defendant contended that the letters were inadmissible because they were not relevant under OEC 401,[5] and, alternatively, that the letters were more prejudicial than probative under OEC 403.[6] Defendant argued that, because the letters were written to J (and mother), neither of whom was an alleged victim of the first-degree sexual abuse charges, "the letters are not relevant and would very likely mislead the jury, and confuse the issues for the jury as well."

At the pretrial conference, defendant added an objection under OEC 404(3).[7] Defendant argued that the state was offering inadmissible character evidence for purposes of OEC 404(3), because the letters pertained to defendant's "disposition or propensity to commit certain crimes, wrongs or acts." According to defendant, "although evidence regarding a person's propensities may have probative value in determining conduct on a particular occasion, [it] is deemed to be outweighed by the nature of misleading the jury and unfairly

---

[5] OEC 401 defines "relevant evidence" as

"evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

[6] OEC 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

[7] OEC 404(3) provides:

"Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

prejudicing a party." Defendant raised a continuing objection to the admissibility of the letters.

The state responded that the letters were admissible for several nonpropensity purposes: *First*, the state contended that the letters were admissible to establish defendant's "intent," *viz.*, that the letters were admissible to prove that defendant's purpose in touching M was, in fact, sexual, rather than benign.

*Second*, the state argued that the letters showed an "absence of accident or mistake." That is, "when [defendant] did go to his sister's house [he] did not accidentally or mistakenly touch the sexual parts of [M]."

*Third*, the state argued that the letters established defendant's "sexual predisposition" toward these particular victims (J and M), as well as "toward girls of that age" generally, because defendant wrote the letters to J when she was age 11 to 12, and, "by the time * * * defendant gets to the home, [M] is the same age that [J] was when he was writing her those letters."

*Finally*, the state contended that the letters established defendant's "motive" because they "are clear evidence that [defendant] is grooming [J] for future criminal victimization." According to the state, defendant's motive was to "continu[e] to groom [J]" by "committ[ing] these sexual abuse crime[s] on [M] * * * in the presence of [J]."

After examining the letters, the trial court stated that

> "some of the * * * provisions that are talking about an unusual sexual interest as far as the threats and the attire and so forth * * * might be relevant. But I don't see how grooming of [J] * * * would be relevant to the sexual acts on [M] and no act, physical act that was given to [J].
>
> "So far I don't have any physical sexual act that was done to [J] that would be warranted in some type of grooming."

The court deferred ruling on the admissibility of the letters.

The state ultimately proffered the letters as evidence in its case-in-chief during J's testimony. The trial court admitted all the letters into evidence as relevant to prove defendant's intent, motive, and absence of mistake or accident:

"[T]hose letters do show, at least they can infer a *sexual intent* towards [J].

"* * * [W]hat is charged * * * is that [J] is being induced knowingly, [defendant] did unlawfully and knowingly induce, cause or permit [J] to witness an act of sexual conduct.

"And why he would be doing that or the reason for it, those letters do explain some reason why he would be subjecting [M] and having questions to her and a discussion with her and the aspects about the condom, * * * all those kinds of things and taking pictures of her, it does go back to *his intent and motive* and those letters are evidence of some *intent or motive*.

"* * * * *

"[The letters] do show *sexual intent* of the defendant to [M] and in relationship to some of the contact, contact and questions to [M]. It does show what his *motive* would be as far as bringing all of that into play during the course of the discussion and the conversation with them.

"And it also goes back into the aspect of why he would be talking about an orgasm or any other aspect or condom or other description of what he was talking about and that goes back to his *motive* in relationship to his physical acts toward the children.

"The objection is overruled. The letters are admissible."

(Emphasis added.)

Defendant reiterated that the letters were nonetheless unfairly prejudicial under OEC 403 and OEC 404(3). In response, the trial court ordered the state to excise any reference to defendant's incarceration at the time he wrote the letters. Additionally, the trial court determined that, as excised, the letters were not more prejudicial than probative under OEC 403 or OEC 404(3):

"[O]ne of the reasons this is not more prejudicial than probative is that the issue of [defendant's] *intent and the*

*motive as to why he was engaged in certain conduct, whether it was an accident or whether it was sexually inclined,* is a particularly relevant issue in this [case], these letters do bear on that, and that's why I found it is not more prejudicial than probative."

(Emphasis added.)

The state presented testimony by an expert pertaining to "grooming" behavior. With respect to touching-related conduct, the state's expert testified that

"the offender may do a lot of wrestling or physical touching with a child that is suppose[d] to indicate * * * accidental touching, accidentally in the process of this wrestling or playing around, oh, my hand * * * touched your bottom or touched your private parts, your breasts. I didn't mean it. And so the child kind of learns to ignore the touching in that context.

"The offender may make statements, comments to the child maybe about their body, about sexual body parts, may[be] they talk about their own sexual activity, kind of drawing a child into their confidence and saying things that we would recognize as inappropriate, but a child may just feel like this adult is giving me a lot of attention, they trust me, they are talking about this personal stuff, this is pretty cool.

"Some offenders will get kids to watch pornography with them or other inappropriate kinds of movies or pictures. Sometimes they will tell them that what I am doing, if they are doing something sexual, is to help educate you so that you'll know how to behave with somebody when you get older.

"They give[ ] lots of different rationales to kids who are very trusting, and who generally are taught to believe and follow the directions of the adults in their lives."

The state's expert testified that grooming typically follows a progression, so that if the child does not report the offender's actions, those actions progress to increasingly invasive types of touching.

The state's expert agreed that letters of a sexual nature written to an 11- or 12-year-old certainly could qualify

as grooming behavior. In this case, defendant's conduct in asking J "if she [was] a virgin or if she had a boyfriend," were typical entry-level questions in grooming behavior. The expert agreed that requesting photos of a child also "certainly can be" considered grooming behavior.

The jury ultimately found defendant guilty of the three counts of first-degree sex abuse based on defendant "[t]ouching [M]'s [b]reast" twice (Counts 1 and 2), and "[t]ouching [M]'s [b]uttocks" (Count 3); three counts of endangering the welfare of a minor based on J twice "witnessing the touching of [M]'s breast" (Counts 4 and 5), and "[J] witnessing the touching of [M]'s buttocks" (Count 6); and three counts of harassment, based on defendant's conduct of "[p]ulling [d]own [M]'s pants" (Count 7), "[r]ubbing [M]'s shoulders" (Count 8), and "[h]olding [J] [w]hile [l]ooking at [h]er [b]reast" (Count 9).[8]

■    On appeal, defendant assigns error to the trial court's admission of the letters that defendant wrote to J and mother. Defendant primarily reiterates his contentions raised before the trial court, arguing that the letters were proffered only to demonstrate that "defendant acted in conformity with his predisposition to young girls" and, thus, were inadmissible under OEC 401, OEC 403, and OEC 404(3). Specifically, defendant contends that the letters were not admissible for *any* purpose. In support of that contention, defendant emphasizes that (1) the letters were sent to J (and mother), not M; and (2) the factual dispute at trial centered on whether defendant had the requisite mental state in touching M. Defendant thus argues that, because the state prosecuted defendant for sexually touching M to arouse or gratify his own "sexual desire," "letters written to other people have no logical relevance to defendant's intent while he played with [M] months later."

The state responds that the trial court properly admitted the letters for nonpropensity purposes of "intent" and "motive" under OEC 401 and OEC 404(3) and asserts

---

[8] The jury acquitted defendant of the fourth count of harassment, which was based on defendant's alleged conduct toward K (Count 10).

that the letters could have been properly admitted as evidence of "plan." Finally, as an alternative basis for affirmance, the state argues that OEC 404(4) prohibited the court from excluding the evidence under OEC 403.[9]

As we will proceed to explain, we conclude that the letters were, in fact, probative of defendant's conscious "motive" in touching M in J's presence. Further, regardless of any reference to OEC 404(4), the trial court did not err in determining that the admission of that evidence comported with OEC 403. Accordingly, the letters were properly admitted.

As noted, OEC 404(3) provides:

"Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of *motive*, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

(Emphasis added.)

■ A three-part test applies when a party seeks to introduce prior bad acts evidence to prove motive under OEC 404(3):

"(1) The evidence must be independently relevant for a noncharacter purpose [such as, in this case, proof of motive]; (2) the proponent of the evidence must offer sufficient proof that the uncharged misconduct was committed and that defendant committed it; and (3) the probative value of the uncharged misconduct evidence must not be substantially outweighed by the dangers or considerations set forth in OEC 403."

---

[9] The state did not invoke OEC 404(4) before the trial court. It provides:

"In criminal actions, evidence of other crimes, wrongs or acts by the defendant is admissible if relevant except as otherwise provided by:

"(a) [OEC 406 through 412] and, to the extent required by the United States Constitution or the Oregon Constitution, [OEC 403];

"(b) The rules of evidence relating to privilege and hearsay;

"(c) The Oregon Constitution; and

"(d) The United States Constitution."

*State v. Johnson*, 313 Or 189, 195, 832 P2d 443 (1992) (footnotes omitted; bracketed material added). Defendant does not dispute that the state satisfied the second step in the test. Defendant focuses instead on the first and third steps.

The first requirement of the *Johnson* test mandates that the evidence of a defendant's prior bad acts be relevant for a noncharacter purpose—in this case, "motive." Defendant contends that the state's intention in presenting the letters was to unfairly impugn his character. The state responds that the letters are relevant to prove defendant's motive in committing the three counts of endangering the welfare of a minor. According to the state, the letters, in combination with the testimony of the state's expert, "permitted an inference that before defendant visited the [girls'] house * * *, he had begun grooming [J] for subsequent sexual conduct." The state argues that that evidence of predicate grooming is, in turn, relevant to show that defendant's motive—his conscious purpose—in touching M sexually in J's presence was to perpetuate the grooming of J. That is, that defendant acted for the purpose of "desensitiz[ing] [J] of any negative feelings she might have about such touching, and to gauge [J]'s reaction to sexual activity before drawing her into actual sexual contact with him."

Motive is "a cause or reason that moves the will and induces action, an inducement which leads to or tempts the mind to commit an act." *State v. Hampton*, 317 Or 251, 257 n 12, 855 P2d 621 (1993) (internal quotation marks omitted). *See generally State v. Bracken*, 174 Or App 294, 302-03, 23 P3d 417, *rev den*, 333 Or 162 (2001) (addressing admissibility of evidence to establish "motive" as distinct from "intent" under OEC 404(3)). Accordingly, to be relevant for the non-propensity purpose of "motive," the letters must have some tendency to show that defendant had a cause or reason to "knowingly * * * [i]nduce[ ], cause[ ] or permit[ ]" J to "witness an act of sexual conduct"—*viz.*, to witness the touching of M's breasts and buttocks in an act of apparent sexual stimulation or gratification. ORS 163.575(1)(a) (describing the offense of "endangering the welfare of a minor"); ORS 167.060(10) (defining the term "sexual conduct" for purposes of ORS 163.575).

Defendant contends that evidence of a sexual inclination or desire toward J was irrelevant to his culpability for the crime of endangering the welfare of a minor. In support of that contention, defendant argues that ORS 163.575 does not require defendant to have any sexual motivation towards the victim (here, J); rather, defendant asserts, that statute merely requires that a defendant knowingly engage in an act of sexual conduct in front of the victim—regardless of the defendant's purpose, including any sexual feelings or motivations towards the victim. *See* 230 Or App at 625 n 3 (quoting ORS 163.575). Thus, defendant contends, motive is irrelevant.

Defendant's understanding of ORS 163.575 is correct, but his conclusion is not. Motive *qua* motive is not an element of the crime of endangering the welfare of a minor; a defendant may be culpable under ORS 163.575 regardless of whether he or she acted for some sexual purpose pertaining to the victim.

That said, however, proof of a defendant's sexual interest in the victim *can* be relevant—and, here, was relevant—in determining whether the defendant engaged in an "act of *apparent sexual stimulation or gratification*," ORS 167.060(10) (emphasis added), with another (here, M) in the victim's (J's) presence. Specifically, evidence of a pattern of grooming behavior directed against J made it more likely that defendant—rather than merely benignly or incidentally touching M in J's presence—touched M in a fashion tantamount to an "act of apparent sexual stimulation or gratification," ORS 167.060(10), so as to expose J to such conduct in an effort to "desensitize" J to sexual touching so that she would ultimately be more susceptible to defendant's future sexual advances.

Here, the state presented evidence from which a jury could conclude that defendant, by way of the letters, was grooming J for future sexual victimization. The state's expert testified in great detail as to what constitutes "grooming." The expert confirmed that writing letters of a sexual nature to an 11- or 12-year-old "certainly" could be seen as grooming

behavior. In particular, the expert stated that defendant's statements to J asking if she was a "virgin" and if she had a boyfriend were "typical entry level questions that are grooming behavior."

The state's expert did not testify as to whether sexually touching one child in front of another child could constitute "grooming." Nonetheless, defendant did not argue to the trial court—and does not argue on appeal—that, to demonstrate relevance, the state was required, as a foundational matter, to present expert testimony that defendant's touching of M in front of J could constitute continued "grooming" of J. *See State v. Leach*, 169 Or App 530, 537, 9 P3d 755 (2000), *rev den*, 332 Or 632 (2001) (declining to address whether the state was required to present expert testimony that the defendant's comments to the victim constituted "grooming" because the defendant failed to contend before the trial court or on appeal that such testimony was required to demonstrate relevance).[10] Absent such a foundational challenge, and, given the very low threshold of relevance, we cannot say that the trial court erred in determining that a logical relationship existed between the letters and defendant's motive to expose J to his touching of M in an "act of apparent sexual stimulation or gratification." *See* Laird C. Kirkpatrick, *Oregon Evidence* § 401.03, 141-42 (5th ed 2007) ("The determination of relevance * * * allows the trial court to draw upon its own experience, knowledge, and common sense in determining whether a logical relationship exists between offered evidence and the fact to be proven.").[11] Accordingly, the first part of the *Johnson* test was satisfied here.

---

[10] Given that procedural posture, we imply no opinion as to the foundational requirements for "grooming" evidence, which remain an unresolved issue in this court. *See Leach*, 169 Or App at 539 ("[t]he foundational requirements for 'grooming' evidence * * * are a hotly contested issue" and "an open question") (De Muniz, P. J., concurring); *see also State v. Stafford*, 157 Or App 445, 972 P2d 47 (1998), *rev den*, 329 Or 358 (1999) (Court of Appeals divided on whether a foundation for scientific evidence is required to admit expert testimony about "grooming" behavior).

[11] Because we conclude that the evidence is relevant for the nonpropensity purpose of "motive," we do not address whether the letters were also relevant for the other proffered nonpropensity purposes, *viz.*, "plan" and "intent."

The third part of the *Johnson* test requires that the letters' probative value "not be substantially outweighed by the dangers or considerations set forth in OEC 403." 313 Or at 195. Evidence is properly excluded under OEC 403 if its "probative value" is "substantially outweighed by," *inter alia*, "the danger of unfair prejudice, confusion of the issues, or misleading the jury." Evidence is "unfairly prejudicial" if it appeals to the preferences of the factfinder for reasons that are unrelated to its capacity to establish a material fact. *State v. Barone*, 328 Or 68, 87, 969 P2d 1013 (1998), *cert den*, 528 US 1135 (2000). We review a trial court's ruling under OEC 403 for an abuse of discretion. *State v. Williams*, 313 Or 19, 29-30, 828 P2d 1006, *cert den*, 506 US 858 (1992). This court "generally defers to the trial court's decision whether the probative value of the evidence is substantially outweighed by the potential for prejudice." *Id.* at 29-30.

Defendant contends that the trial court abused its discretion by admitting the letters over his OEC 403 objection, because the court did not conduct the four-step inquiry established in *State v. Mayfield*, 302 Or 631, 645, 733 P2d 438 (1987) (a trial court is required to (1) "assess the proponent's need" for the proffered evidence; (2) "determine how prejudicial the evidence is"; (3) balance the proponent's need for the evidence against the danger of unfair prejudice; and (4) make a ruling to admit all, part, or none of the proffered evidence). *See State v. Sewell*, 222 Or App 423, 428, 193 P3d 1046 (2008), *adh'd to on recons*, 225 Or App 296, 201 P3d 918 (2009) (trial court errs if it fails to make a record showing that it engaged in the four-step *Mayfield* analysis). Defendant argues that "the record provides none of the deliberation that *Mayfield* mandates."

The state responds that it is evident from the totality of the record that the trial court did, in fact, engage in the requisite *Mayfield* analysis, even if it did not explicitly express its ruling in *Mayfield*'s rubric. The state also raises, for the first time on appeal, an alternative basis for affirmance—*viz.*, that OEC 404(4) prohibited the court from excluding the letters under OEC 403.

Defendant, in turn, contends that OEC 404(4) did not prohibit the court from excluding the evidence under OEC 403, because OEC 404(4) violates the state and federal equal protection clauses and the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The state remonstrates that defendant's constitutional challenges to OEC 404(4) are not properly before us because they were not preserved, and, in any event, neither the state nor federal constitutions required OEC 403 balancing in this case.

Because the parties' contentions regarding OEC 404(4) have constitutional implications, we address whether the trial court erred in admitting the letters over defendant's OEC 403 objection before addressing whether OEC 404(4) would, nevertheless, have precluded the court from excluding the letters on that basis. *Planned Parenthood Assn. v. Dept. of Human Res.*, 297 Or 562, 564, 687 P2d 785 (1984) ("This court follows the principle that constitutional issues should not be decided where there is an adequate statutory basis for a decision.").

We conclude that the trial court's ruling comported with *Mayfield*. We recognize that *Mayfield* established an "approved method of analysis" that should guide trial courts in their decision-making under OEC 403. *State v. Walton*, 311 Or 223, 235, 809 P2d 81 (1991). In this case, however, "notwithstanding the fact that the court did not expressly follow the *Mayfield* analysis," the record establishes that, in deciding to admit the letters, the trial court considered the matters prescribed in *Mayfield*. *State v. Meyers*, 132 Or App 585, 588, 889 P2d 374 (1995).

The trial court made the following findings:

"[O]ne of the reasons this is not more prejudicial than probative is that the issue of [defendant's] intent and the motive as to why he was engaged in certain conduct, whether it was an accident or whether it was sexually inclined, is a particularly relevant issue in this, these letters do bear on that, and that's why I found it is not more prejudicial than probative."

The court went on to conclude that, under OEC 403, the state was required to excise from the letters any reference to defendant's incarceration at the time he wrote the letters.

Although the court's statements are not extensive, the totality of the attendant circumstances indicate that the court did engage in the " 'conscious process of balancing the costs of the evidence against its benefits' " that *Mayfield* requires. *State v. Pinnell*, 311 Or 98, 112, 806 P2d 110 (1991) (quoting Wright & Graham, 22 *Federal Practice and Procedure* § 5214, 263-64 (1978)). First, the court's finding, that the letters were "particularly relevant" to defendant's motive or intent and to whether the touching was an accident or mistake, manifests the court's opinion that the state's need for the proffered evidence was particularly significant.

Second, and strikingly, the trial court did not admit the letters wholesale and indiscriminately; instead, the court excluded some content in the letters regarding defendant's incarceration. That exclusion evinces a conscious, nuanced consideration of the unfairly prejudicial potential of certain aspects of the letters' content.

This case represents a close discretionary call. To be sure, admission of the letters presented the possibility that jurors would draw impermissible propensity-related inferences from the evidence. Indeed, it is possible that, if presented with the matter in the first instance, we might have struck the discretionary balance differently. But, ultimately, that is immaterial. What *is* material is that the trial court's determination was within the range of legally permissible outcomes. *See State v. Rogers*, 330 Or 282, 312, 4 P3d 1261 (2000) ("abuse of discretion" means that the court's decision was not "within the range of legally correct discretionary choices").[12]

In sum, the trial court, in admitting the letters with certain redactions, permissibly exercised its discretion in a

---

[12] Our conclusion that the trial court did not err in admitting the letters over defendant's OEC 403 objection obviates any consideration of the applicability of OEC 404(4), including defendant's contentions challenging the constitutionality of that provision.

manner that comported with *Mayfield* and *Johnson*. Accordingly, the court did not err.[13]

Affirmed.

---

[13] We so conclude notwithstanding defendant's contention that the trial court erred because it did not conduct an analysis under *State v. Johns*, 301 Or 535, 555-56, 725 P2d 312 (1986), in determining whether the letters were admissible. That contention is not reviewable, because defendant never invoked *Johns*, or otherwise cogently referred to its requirements, before the trial court, *see State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000), and does not contend that the court's purported default in that regard constituted an "error of law apparent on the face of the record." ORAP 5.45(1). Although defendant did advance a general objection to the evidence on OEC 404(3) grounds, that objection did not suffice to specifically alert the trial court to a *Johns*-based argument. *Wyatt*, 331 Or at 343; *cf. State v. Irons*, 162 Or App 512, 520-21, 987 P2d 547 (1999), *rev den*, 330 Or 120 (2000) (holding that defendant preserved a *Johns*-based argument when, in addition to broadly invoking OEC 404(3) and asserting that none of the exceptions to that rule applied, the defendant contended that the state did not allege that there was a "signature crime," because the defendant's reference to "signature crime" fairly alerted the trial court and the state that the *Johns* analysis was "fairly 'in play' ").

In all events, defendant's present contention would not satisfy the requisites of plain error. *See, e.g., State v. Blanscet*, 230 Or App 363, 368, 215 P3d 924 (2009) (holding that the *Johns* test is not applicable when prior bad acts evidence is offered not to prove intent, but to show that the defendant had a motive to commit the crime); *Leach*, 169 Or App at 536 ("*Johns*, by its terms, controls only where 'prior bad acts' evidence is offered to prove intent.").